UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

FEDERAL TRADE COMMISSION and
STATE OF FLORIDA,

       Plaintiffs,

v.                                Case No:  2:17-cv-228-FtM-99MRM

VYLAH TEC LLC, EXPRESS TECH HELP
LLC, TECH CREW SUPPORT LLC,
ANGELO J. CUPO, ROBERT CUPO and
DENNIS CUPO,

       Defendants.

_____/

## OPINION AND ORDER[1]

     Before the Court is Plaintiffs Federal Trade Commission and State of Florida's (collectively, "the Government") Motion to Reinstate the Freeze Over Assets Jointly Held by Robert and Olga Cupo and Assets Held by Dennis Cupo. (Doc. 194). Defendants Vylah Tec, LLC, Express Tech Help, LLC, Tech Crew Support, LLC, Angelo Cupo, Robert Cupo, and Dennis Cupo (collectively, "Defendants") oppose the motion. (Doc. 195). The undersigned held a hearing on the Government's motion, where the parties appeared with counsel and argued their respective positions. (Doc. 227). For the following reasons, the Court denies the Government's motion.

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or websites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites. Likewise, the Court has no agreements with any of these third parties or their websites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

# BACKGROUND

## A. Vylah Tec LLC

To frame the Government's motion, the Court must outline Vylah Tec LLC's business structure and operations. Vylah Tec is a family-owned business. Robert and Angelo, a father-son duo, formed Vylah Tec in May 2014. (Doc. 4-2 at 3, 11-12). A few months later, the company began doing business as VTec Support. (*Id.* at 18). As business grew, Robert and Angelo also formed Tech Crew Support, LLC in January 2015 and Express Tech Help, LLC in March 2015. (*Id.* at 3-4, 20-21, 26-27). Tech Crew and Express Tech function much like "doing business entities" of Vylah Tec. (Doc. 195-11 at 10:7-19). In practice, Robert owns Vylah Tec, Tech Crew, and Express Tec, while Angelo manages them much like a chief executive officer. (Doc. 32-1 at ¶ 3; Doc. 63 at ¶¶ 12-13; Doc. 195-11 at 9:13-21; Doc. 195-12 at 67:20-68:4).

Two more Cupos are/were in the family business: Dennis and Olga. Dennis is Robert's brother and Angelo's uncle. Olga is Robert's wife. Dennis was named an Express Tech manager in the corporate filings when the company first formed, but he was removed a year later. (Doc. 4-2 at 20-24). Olga is a manager for Express Tech and a registered agent for Tech Crew. (*Id.* at 4, 20-24, 26).

Vylah Tec, Tech Crew, and Express Tec (collectively, "Vylah Tec") run a call center. Their primary business is prepaid technical support services for electronic devices that consumers buy on home shopping channels. Vylah Tec contracts with non-party Avanquest North America LLC, who, in turn, sells software with Vylah Tec's support services to the home shopping companies. (Doc. 32-1 at ¶ 5; Doc. 195-11 at 11:5-12:14). So, when consumers buy devices, their purchase include Vylah Tec's support services

for free.  In addition to technical support, Vylah Tec also sells security software, utility software, and data backup services to individual consumers.  (Doc. 32-1 at ¶¶ 5, 11).

The only difference between Vylah Tec, Tech Support, and Express Tec is the home shopping channel customer they service.  (*Id.* at ¶ 4; Doc. 195-11 at 85:23-86:12; Doc. 195-12 at 151:12-152:4; Doc. 195-13 at 17:1-19).  Vylah Tech supports the Home Shopping Network.  Tech Crew supports QVC-U.K.  Express Tech supports Evine Live.  Angelo and Robert thought it best that each home shopping channel have its own separate technical support brand.  The companies otherwise share the same workspace, managers, employees, equipment, scripts, and the like.  (Doc. 195-13 at 17:12-19; Doc. 195-12 at 152:5-7).

## B. Alleged Deceptive Scheme

On May 1, 2017, the Government sued Defendants for violating the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 41-58, and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201-501.213.  According to the Government, Defendants have a deceptive scheme related to scripted sales pitches and selling antivirus software.  The Government takes specific issue with Defendants (1) using pop-up messages with allegedly phony warnings that a virus infected the consumer's computer; (2) using scripted sales pitches to falsely diagnose consumers' computers with technical problem and misleading consumers into buying software and repairs; and (3) misrepresenting Vylah Tec as a Microsoft affiliate and its employees as Microsoft-certified technicians.  (Doc. 2 at ¶¶ 17-20).  The Government says Defendants' deceptive scheme has swindled more than $1.8 million from consumers.  It thus seeks injunctive relief, disgorgement of Defendants' ill-gotten gains, and restitution.  (*Id.* at 15-16).

**C. Temporary Restraining Order and Preliminary Injunction**

On May 2, 2017, the Court issued an *ex parte* Temporary Restraining Order ("TRO") that shutdown Vylah Tec's business, appointed a receiver, and froze Defendants' assets. (Doc. 9). A month later, the Court heard arguments on converting the TRO into a preliminary injunction. Because Defendants effectively stipulated to the Court imposing a preliminary injunction, the hearing focused on whether the Court should reopen Defendants' business and unfreeze assets to restart the business and pay for attorneys' fees and living expenses. In the end, the Court entered a preliminary injunction that did not restart the business and froze most of Defendants' assets and assets held for their benefit. (Doc. 62).

Defendants appealed the preliminary injunction as overbroad. The Eleventh Circuit affirmed the preliminary injunction except for the freeze on Dennis' assets and Robert and Olga's joint assets. (Doc. 192). The Eleventh Circuit explained:

> [t]he district court did not make sufficient factual findings to support freezing those assets. While the court stated in the TRO that [the Government] has 'sufficiently shown that . . . Dennis . . . [has] engaged in and [is] likely to engage in acts and practices that violated [the FTCA and FDUTPA],' the court did not find that Dennis gained anything from the allegedly unlawful practices. . . Similarly, the district court made no findings as to Olga's involvement, if any, in the alleged scheme, nor did it explain why assets she holds jointly with Robert are subject to a freeze regardless of whether she was involved. . . Such factual findings were needed to justify including the freezes on Dennis's assets and the jointly held assets within the scope of the injunction.

(*Id.* at 7-8 (internal citations omitted and alterations in original)). The Eleventh Circuit thus remanded the matter for this Court to make further findings of fact and conclusions of law on these two issues. (*Id.* at 8).

While Defendants appealed the preliminary injunction, this case continued with discovery. The record is now more developed than when the Court first heard arguments on the preliminary injunction over a year ago. The Government has finished discovery. The individual Defendants and employees have been deposed. Documents have been exchanged. Dennis has even filed a motion for summary judgment. Against this procedural backdrop, the Court will turn to deciding whether to reinstate asset freezes on Dennis as well as Robert and Olga.

## LEGAL STANDARDS

The FTCA authorizes district courts to grant preliminary and permanent injunctions against practices that violate the statute. 15 U.S.C. § 53(b). The power to issue injunctions also allows monetary equitable relief like disgorgement and consumer redress. *See FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1239 (11th Cir. 2017) (stating "the unqualified grant of statutory authority to issue an injunction under section 13(b) carries with it the full range of equitable remedies" (internal quotations omitted)); *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996) (noting that disgorgement of profits is a proper remedy under the FTCA). A court measures disgorgement by a defendant's unjust enrichment, not consumer loss. *See FTC v. Wash. Data Res., Inc.*, 704 F.3d 1323, 1326 (11th Cir. 2013); *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005) (stating "the power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing. Any further sum would constitute a penalty assessment." (citation omitted)). Also, "[d]isgorgement does not require the district court to apply equitable tracing rules to identify specific funds in the defendant's possession that are subject to return." *FTC v. Lanier Law, LLC*, No. 3:14-

CV-786-J-34PDB, 2015 WL 9302786, at *2 (M.D. Fla. Dec. 22, 2015) (internal quotes and citations omitted).

To make disgorgement and other relief possible, a district court may order an asset freeze. *See ETS Payphones*, 408 F.3d at 734 (stating "the asset freeze is justified as a means for preserving funds for the equitable remedy of disgorgement"); *Gem Merch.*, 87 F.3d at 469 ("[A] district court may order preliminary relief, including an asset freeze, that may be needed to make permanent relief possible."); *see also FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1234 (11th Cir. 2014) ("An asset freeze is within the district court's equitable powers."). An agency's "burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light: 'a reasonable approximation of a defendant's ill-gotten gains [is required] . . . 'Exactitude is not a requirement.'" *ETS Payphones*, 408 F.3d at 735 (citation omitted and alteration in original).

## DISCUSSION

The Eleventh Circuit has given the Court clear directions on the factual findings needed to freeze Dennis' assets and Robert and Olga's joint assets. The Court will address both assets in turn, starting with Dennis.

### A. Dennis' assets

The Court must make factual findings as to whether Dennis gained anything from the unlawful practices alleged in the Complaint. (Doc. 192 at 7). The Government offers no help – it gives no evidence or arguments on what Dennis gained. Instead, the Government muddies a straightforward matter by sidetracking the Court with an off base legal argument on joint and several liability. Because the Court has been tasked to decide

what Dennis gained from the unlawful practices, it has carefully reviewed the record and makes the following findings:

The Government has presented no evidence that Dennis gained anything monetarily from Vylah Tec. He did not even receive a paycheck or other payment from the company, let alone funds from Vylah Tec's allegedly deceptive scheme. (Doc. 32-3 at ¶ 10; Doc. 195-16 at 20:8). Although Dennis let Robert put his name on certain documents to help his brother and nephew, he neither expected nor received any financial benefit from doing so. (Doc. 195-16 at 20:4-11). The only evidence of financial ties between Robert and Vylah Tec is $3,500 deposited into the bank account of Dennis' employer to cover his commission draws while he was recovering from heart surgery. (Doc. 32-3 at ¶ 10). Beyond this one-time deposit, which appears completely gratuitous, there is no evidence that Dennis received financial benefit from Vylah Tec.

It makes sense that Vylah Tec did not pay Dennis because he had almost no involvement with its business affairs and corporate policies. Dennis was unlike his brother and nephew. He was rarely involved: he did not start Vylah Tec, understand the business, play a role in its day-to-day operations, or have supervisory and hiring authority. (Doc. 32-3 at ¶ 8; Doc. 195-11 at 85:21-22; Doc. 195-12 at 29:14-30:2, 60:17-25; Doc. 195-13 at 19:7-25; Doc. 195-15 at 19:1-9; Doc. 195-16 at 9:7-10:9, 68:1-8). And most telling here, Dennis did not write or see any sales scripts the Government views as deceptive. (Doc. 195-13 at 121:7-16, 122:24-25; Doc. 195-14 at 27:9-28:7; Doc. 195-16 at 68:4-7). He never heard the term "script" until this case. (Doc. 195-16 at 68:4-7). Dennis also visited the call center less than a handful of times. (Doc. 195-12 at 59:20-21; Doc. 195-16 at 17:6-15). Corroborating Dennis' absence from Vylah Tec is one of the script writers

testifying that he had "[n]o idea" who Dennis was and never saw his name on documents. (Doc. 195-14 at 109:3-6).    Another seasoned employee testified that she would not recognize Dennis, never received an email from him, and never spoke to him on the telephone.  (Doc. 195-17 at 151:25-152:21).

At the hearing, the Government suggested that Dennis may have emotionally benefited from helping his brother and nephew with the family business.  At first blush, this argument appears reasonable.  But the record suggests that Robert's efforts to have Dennis contribute to the business failed.  Angelo testified that Robert talked to Dennis about "coming on over and helping us with the company.  [But that i]t didn't work out." (Doc. 195-13 at 19:7-18).  Although Dennis thought it would be nice to join his family, he did not like Fort Myers, so he never moved.  (Doc. 195-16 at 10:4-9, 11:2-7, 17:6-25; 65:3-19).  When asked whether Vylah Tec has been part of his most current work history, Dennis said

> I have to say Vylah Tec was more of a dream than a work history.  My family moved to this coast; I was the only one left on the east coast of Florida; and we thought maybe if that worked out, it might be a future way for me to go.  Especially since the heart surgery my workload has gone down a lot, and thought that maybe this would be something where I could add something or bring something to the table.  Unfortunately, it just didn't work out.

(Id. at 7:20-8:5).  Dennis was not an active member in furthering the family business, and the record falls short of showing that he gained anything from the unlawful practices the Government attacks in this suit.

At bottom, the Government's position amounts to equating a tangible benefit to Dennis because he is part of the same family as the named individual Defendants.  But to accept this argument would threaten to change the character of the law.  Such a

position has no plain limiting principle – it amounts to guilt by familial association.  The Government has not (and cannot) cite to any authority to support such a broad interpretation of this Court's authority.

In directing this Court to decide what Dennis gained from the unlawful practices, the Eleventh Circuit relied on the principle that, "[b]ecause disgorgement does not serve a punitive function, the disgorgement amount . . . may not exceed the amount obtained through the wrongdoing."  (Doc. 192 at 7 (citing *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014)).[2]  The Government argues that *Contorinis* is favorable to its position.  In that case, the SEC sued an insider trader for disgorgement of unlawful profits that he earned for a third-party.  After a jury convicted the inside trader for securities fraud in the parallel criminal case, the district court entered summary judgment in the civil suit and ordered the insider trader to disgorge the unlawful profits.

On appeal, the Second Circuit examined "whether an insider trader who trades on behalf of another person or entity using funds he does not own, and thus produces illegal profits that he does not personally realize, can nevertheless be required to disgorge the full amount of illicit profit he generates from his illegal and fraudulent actions."  743 F.3d at 299.  The Second Circuit rejected the insider trader's position that he should disgorge only the amount he directly gained as personal pecuniary benefit.  *Id.* at 305.  It also stated that

> [w]hether the defendant's motive is direct economic profit, self-aggrandizement, psychic satisfaction from benefitting a loved one, or future profits by enhancing one's reputation as a successful fund manager, the insider trader who trades for another's account has engaged in fraud, secured a benefit

---

[2] The Eleventh Circuit cited *Contorinis* as its own precedent, but it is a Second Circuit decision.  (Doc. 192 at 7).

> thereby, and directed the profits of the fraud where he has chosen them to go.

*Id.* at 303.

Based on *Contorinis*, the Government asserts that Dennis' disgorgement amount is not limited to his direct pecuniary benefit because doing so "'would run contrary to the equitable principle that the wrongdoer should bear the risk of any uncertainty affecting the amount of the remedy.'" (Doc. 194 at 10 n.3 (citing *Contorinis*, 743 F.3d at 306)). This argument skips a few steps. For one thing, it only works if Dennis is a "wrongdoer." The evidence above clearly suggests otherwise. Beyond that, the Court is not deciding any disgorgement amount. As per the Eleventh Circuit, it must decide whether Dennis gained anything from the unlawful practices to justify freezing his assets. And the record does not show that he gained any direct, indirect, or intangible illicit benefit. Under the Eleventh Circuit's decision, the Court finds no justification to freeze Dennis' assets.

Rather than show what Dennis gained, the Government argues his assets should be frozen because he is jointly and severally liable for monetary damages the Corporate Defendants may pay for violating the FTCA and FDUTPA. According to the Government, "the fact that Dennis may not have received a significant financial benefit is not relevant to the fact that he is jointly and severally liable for the enterprise's unjust gains." (Doc. 194 at 11). Even if true, the Eleventh Circuit has made clear that Dennis' assets should not be frozen if he gained nothing from the unlawful practices. Also, the Government's reliance on joint and several liability is telling – this is because it simply cannot show Dennis benefited from the Corporate Defendant's conduct. Regardless of the Government's joint and several liability argument all but overlooking the Eleventh Circuit's directive, the Court will discuss this issue below.

It is well-settled that individual defendants may be liable for their company violating the FTCA. But this extended accountability is not automatic. To prove such liability, the FTC must show (1) the company violated the FTCA; (2) the individual took part directly in the deceptive practices or had authority to control them; and (3) the individual had knowledge of the deceptive practices. *See IAB Mkg.*, 746 F.3d at 1233 (citations omitted). The FTC may show authority to control by evidence of the individual's "'active involvement in business affairs and the making of corporate policy' and by evidence that 'the individual had some knowledge of the practices.'" *Id.* (citing *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989)). Because the Government has shown a likelihood of success on the merits for the preliminary injunction, the Court focuses on the second and third prongs.[3]

The Government asserts that Dennis had authority to control because, "during the course of the operation, he knowingly held himself out as an owner and substantially assisted the deceptive scheme." (Doc. 194 at 2). Not so. Dennis never owned Vylah Tec, Tech Crew, or Express Tec. He was an Express Tech member for only sixteen months until Robert and Olga become the sole members in July 2016. (Doc. 4-2 at 20-24). Dennis was an authorized signer for an Express Tech's checking/savings account, and he let Robert sign his name to documents in the company's beginning months. (Doc. 4-11 at 21; Doc. 194-5 at 3:10-15; 4:3-25). But neither fact outweighs the evidence outlined above that shows Dennis was rarely, if ever, involved in Vylah Tec's business

---

[3] In stipulating to the preliminary injunction, the parties effectively agreed to the Government's likelihood of showing the Corporate Defendants violated the FTCA and FDUTPA. The stipulation ends there, however. It does not extend to Dennis also being jointly and severally liable for the violations. In other words, the Government cannot bootstrap Dennis' liability to the first preliminary injunction finding.

affairs and corporate policy.  His lack of involvement is also consistent with his ignorance of the scripts and knowing about the so-called misleading pop-up ads or other misrepresentations made to consumers.  *See Gem Merch.*, 87 F.3d at 467-68, 470 (affirming the district court's decision to hold the defendant's sole owner individually liable where he "was aware that salespeople made material representations to consumers to induce sales, and he was in a position to control the salespeople's behavior").

The Government does not stop there.  It relies heavily on merchant processing accounts to show Dennis' authority to control and knowledge of the scheme.  Dennis supposedly opened four merchant processing accounts from February 2015 to June 2015: two for Tech Crew and the others for Express Tech and Tech Logic Support, LLC. The accounts closed within months because of high chargeback rates.  Without the accounts and Dennis personally guaranteeing them, the Government says Defendants would not have "bilk[ed] millions of dollars from consumers."  (Doc. 194 at 2).  This is an overstatement based on the Government's own evidence.

To start, Dennis testified that he could not recall helping to get credit card or merchant processing for Tech Crew, Tech Logic, or Express Tec.  (Doc. 195-16 at 16:11-17:5).  Even setting aside Dennis' uncontroverted testimony, the merchant processing accounts are not the smoking gun the Government portrays.  On February 5, 2015, Tech Crew completed a New Merchant Application.  (Doc. 4-30 at 5-9).  The Government implies that Dennis did the application.  But the Court is not so sure as Robert signed the application six days before Dennis.  (*Id.* at 9-10).  Also, Robert is listed as Tech Crew's contact person, managing director, and owner – not Dennis.  (*Id. at* 5-6).  Although Dennis is named once on the application, the reference to him is illegible.  (*Id.* at 5).  The

Government also says that Dennis personally guaranteed the account, but the document is too illegible to confirm.  (*Id.* at 5, 10).  That said, the account was closed around June 24, 2015, "due to rising chargebacks and bad business practices."  (*Id.* at 15-18).

Before Tech Crew's account closed, Dennis opened an account for Tech Logic on April 28, 2015.  (Doc. 4-8 at 19).  Although Dennis is listed as the owner with 100 percent equity, Robert is named as the contact person and his email address is provided.  (*Id.* at 19).  The Government says this account was "quickly terminated due to a high chargeback rate," but it does not give a correct citation to support the statement.  (Doc. 194 at 8 (citing PX 07 (EMS, pp. 18-24)).

On June 11, 2015, a second account was opened for Tech Crew.  (Doc. 4-8 at 5-7).  The Merchant Agreement names Dennis as the manager with 100 percent equity ownership.  (*Id.* at 5).  It also says that Tech Crew did not accept VISA/MasterCard/Discovery because it "got shut off."  (Doc. 4-8 at 5).  Robert testified, however, that a bank employee likely filled out the paperwork because he did not recognize the handwriting as his or his brother's.  (Doc. 195-11 at 187:3-188:10).  Robert also said that he probably signed the documents for Dennis.  (*Id.* at 188:11-25).  The account closed within a few weeks because of "Violation of Standards" without further explanation.  (Doc. 4-8 at 16).

Dennis opened a fourth account in June 2015 for Express Tech.  (Doc. 4-11 at 5-16).  In the application, Dennis and Robert are named the "Owners or Officers."  (*Id.* at 17).  But it appears the Merchant Agreement's signature page was changed on July 17, 2015, so that Robert – not Dennis – signed the Agreement.  (*Id.* at 15-16).

Much of the Government's argument on the merchant processing accounts is unsupported. For example, the Government contends that Dennis should have known that Vylah Tec was engaged in fraud and deception because some accounts closed because of high chargebacks. But this is a leap too far – it is not an inference the Court can accept. *See Durham v. Whitney Info. Network, Inc.,* No. 06-00687, 2009 WL 3783375, at *14 (M.D. Fla. Nov. 10, 2009) ("The increase in chargebacks does not give rise to an inference of scienter."). And beyond the Government's bold assertions, there is no evidence to suggest Dennis acted recklessly, was indifferent to knowing about the deceptive practices, or intentionally avoided the truth. Also, conspicuously absent from the Government's brief is that Robert opened a merchant account at First Citizens Bank for Tech Crew in September 2015 that made no mention of Dennis. (Doc. 4-11 at 26-42). At bottom, the record does not show that Dennis had knowledge of the deceptive scheme or that he financially enabled Vylah Tec to "reap over $2 million from consumer victims," as the Government states. (Doc. 194 at 9).

In conclusion, the record does not show that Dennis gained anything economically, emotionally, or otherwise from the unlawful practices to justify freezing his assets. Accordingly, the Court denies the Government's motion to reinstate the freeze on Dennis' assets.

**B. Robert and Olga Cupo's joint assets**

The Court now turns to Robert and Olga's joint assets. Under the Eleventh Circuit's decision, the Court must make factual findings as to what involvement Olga had in the alleged scheme; and why her joint assets with Robert are subject to a freeze regardless of her involvement. These findings are necessary because "funds subject to

a freeze must be 'a reasonable approximation of a defendant's ill-gotten gains.'" (Doc. 192 at 8 (citation omitted)).  Two joint assets are at issue: a home and a checking account.[4]

The Government has presented no evidence to persuade the Court that Olga was involved in the alleged deceptive scheme.  Although Olga worked at Vylah Tec, had supervisory authority, and was a signatory on some financial accounts, the pertinent question is not whether Olga was an employee at Vylah Tec.  At issue is whether she was complicit in the alleged scheme.  And the record is silent on the latter.

Olga did not write or edits scripts.  (Doc. 195-13 at 123:1-2; Doc. 195-14 at 27:9-21).  Nor did she make copies of scripts.  (Doc. 195-14 at 109:22-23).  Although Olga monitored sales calls, she watched for common courtesy, professionalism, and ways for employees to improve.  (Doc. 195-12 at 57:13-58:10, 187:16-188:5; Doc. 195-14 at 110:8-18; Doc. 195-17 at 116:8-16, 117; Doc. 195-19 at 83:1-84:22).  Her monitoring was limited in this fashion because she did not know the scripts and technical aspects of the service. (Doc. 195-12 at 187:16-188:5; Doc. 195-19 at 159:21-160:1).  And she did not discipline managers or sales employees.  (Doc. 195-14 at 111:2-21; Doc. 195-17 at 116:17-18).  Olga had an office at the call center but was there intermittently.  (Doc. 195-12 at 56:10-18; Doc. 195-17 at 116:24-117:3; Doc. 195-19 at 82:17-23).  Some weeks she came to the call center daily, other times she would be absent for weeks.

---

[4] By way of background, the Court originally froze Robert's personal assets, including assets he partially owned or held for his indirect benefit, because of his unchallenged involvement in the alleged deceptive scheme.  (Doc. 62).  No party challenged freezing Robert's assets held jointly with Olga at the preliminary injunction hearing.  The Eleventh Circuit, nevertheless, found that Defendants preserved their right to appeal the freeze of these joint assets.  (Doc. 192 at 7).

The evidence shows Olga held a role akin to personnel manager, and she was removed from the technical side of Vylah Tec's business. Dennis described Olga as Vylah Tech's "watchdog on everything that happened." (Doc. 194-5 at 5:13-17). In this role, she handled back-office accounting, verified payroll, reviewed new hire paperwork, and other bookkeeping functions. (Doc. 195-12 at 29:14-24, 55:3-20). Olga also checked employees for compliance with office rules like dress code, smoking, tardiness, and not wasting company time. (Doc. 195-11 at 47:3-12; Doc. 195-19 at 15:1-16:10, 83:21-84:20). One employee testified that Olga watched his work because "[s]he didn't trust anyone." (Doc. 195-18 at 121:15-122:1). None of this evidence suggests that Olga was "substantively involved in the [fraudulent] operation," as the Government portrays. (Doc. 194 at 6). In fact, it suggests she was several steps removed.

Having found the Government has fallen short of showing that Olga was involved in the scheme, the Court must next decide whether it should nevertheless freeze her joint assets with Robert. The Eleventh Circuit's decision makes clear that the Government must tie the joint assets to the deceptive scheme because "funds subject to a freeze must be 'a reasonable approximation of a defendant's ill-gotten gains.'" (Doc. 192 at 8 (citing *ETS Payphones*, 408 F.3d at 735)). On this point, the Government turns to a constructive trust because, as stated at the hearing, "the 11th Circuit opinion has made [the] standard a lot higher in this case, and so [the Government is] being responsive to that new, higher standard in terms of arguing why [it] believes the jointly held assets should remain frozen." (Doc. 235 at 50:15-19). Specifically, the Government argues Robert and Olga's home and joint checking account are subject to a constructive trust because they derive from proceeds of Defendants' deceptive practices and are directly traceable to the fraud

alleged in the Complaint. (Doc. 194 at 3). And the Government argues that a constructive

trust falls within the Court's arsenal of remedies it may use to preserve the joint assets

for future relief.

"The doctrine of constructive trusts is a recognized tool of equity designed in

certain situations to right a wrong committed and to prevent unjust enrichment of one

person at the expense of another either as a result of fraud, undue influence, abuse of

confidence or mistaken in transaction." *In re Fin. Federated Title and Trust, Inc.*, 347

F.3d 880, 891 (11th Cir. 2003) (citation omitted). A constructive trust "is a creature of the

common law, rather than any federal statute." *FTC v. Network Servs. Depot, Inc.*, 617

F.3d 1127, 1141 (9th Cir. 2010) (citation omitted). Where property has been obtained by

fraud, "a court in equity has jurisdiction to reach the property either in the hands of the

original wrongdoer, or in the hands of any subsequent holder" and to convey that property

to "the one who is truly and equitably entitled to the same." *Harris Tr. & Sav. Bank v.

Salomon Smith Barney, Inc.* 530 U.S. 238, 251 (2000) (citations omitted). "Once an

equitable lien is imposed, the property can be sold and the proceeds applied in favor of

the lien holder." *See FTC v. Am. Precious Metals, LLC*, No. 11-61072-CIV, 2017 WL

1323466, at *1 (S.D. Fla. Apr. 10, 2017), *aff'd,* 726 F. App'x 729 (11th Cir. 2018) (citations

omitted). Against this backdrop, the Court will address Robert and Olga's joint personal

checking account and home.

### 1. *Joint personal checking account*

Robert and Olga have a joint personal checking account ending 9533. Vylah Tec

deposited $30,088.58 into the account between November 14, 2014 and March 3, 2017.

(Doc. 194-1 at ¶ 10). The account had $23,388.69 when the TRO was entered. (Doc.

194-6 at 2).  Assuming a constructive trust, the Government argues that all $23,388.69 came directly from Defendants' deceptive scheme.  (Doc. 194 at 4-5).  It uses two legal principles to get there: the lowest intermediate balance rule and the replenishment rule.  Under the lowest intermediate balance rule, the Government says the Court can presume Robert and Olga spent "clean" money and the balance is "dirty."  (Id. at 5).  Coupled with the replenishment rule, the Government says the Court can thus presume the $23,388.69 is replenished "dirty" money.  (Id.).

The Government relies on *FTC v. Am. Precious Metals, LLC*, No. 11-61072-CIV, 2017 WL 1323466, at *2 (S.D. Fla. Apr. 10, 2017), *aff'd,* 726 F. App'x 729 (11th Cir. 2018) to support these assumptions.  In *American Precious*, the defendant entered a stipulated final judgment with the FTC agreeing to pay $24.4 million as equitable relief.  When he did not pay, the FTC moved for an equitable lien on his home.  The agency used a forensic accountant to trace the proceeds the defendant received from the scheme to the home and attached the accountant's declaration that explained her findings, method, and supporting documents.  The district court found, "[a]lthough [the defendant] commingled the fraudulently obtained funds with legitimately obtained funds, the commingling of funds does not defeat a claim for an equitable lien."  *Id.,* at *2 (citations omitted).  It explained,

> Florida courts have created certain presumptions for tracing commingled funds . . . First, courts apply the "lowest intermediate balance rule," which presumes that the person who controls the commingled funds will first dissipate his own funds, rather than those that were fraudulently obtained . . . Second, courts apply the replenishment rule, which presumes that when funds are replenished in a commingled account, the person who controls the commingled funds will first replenish any fraudulently obtained funds.

*Id.* (citation omitted).  The forensic accountant applied both presumptions to trace the defendant's fraudulently obtained funds in his bank records.  The district court thus found the FTC showed the defendant used fraudulently obtained funds for his home.  *Id.*  On appeal, the defendant challenged only the accountant's declaration as inadmissible hearsay and the district court not holding an evidentiary hearing.  *FTC v. Am. Precious Metals, LLC*, 726 F. App'x 729, 731 (11th Cir. 2018).  The Eleventh Circuit rejected both arguments and never addressed the merits of the presumptions.

The procedural posture of *American Metals* differs from this case, which makes all the difference.  Here, the Court must decide whether to freeze Robert and Olga's joint checking account to preserve funds should the Government prevail on the merits.  In *American Metals*, the district court had to decide whether to issue an equitable lien *after* the defendant entered a stipulated judgment in which he agreed "that the allegations of fraudulent conduct in the first amended complaint would be taken as true in any later collection acts."  *Id.* at 732.  In other words, the court in *American Metals* was working from a baseline where the constructive trust existed and supported by the defendant's concession.  Such is not the case here.  Another glaring difference is that Olga is not a named defendant.  Thus, the Government cannot attach the preliminary injunction finding that it will likely succeed on the merits as to Olga.  Finally, the Government's forensic accountant calculated gross receipts, and did not trace money in the joint checking account back to the deceptive scheme.  (Doc. 194-7 at ¶¶ 5, 9 (explaining "gross receipts equals the total amount of receipts from consumers reduced by the amounts of chargebacks and refunds")).

What is more, the Government conceded at the hearing that a constructive trust is needed before a court applies the lowest intermediate balance rule and the replenishment rule. (Doc. 235 at 36:14-25); *see also In Re Hecker*, 316 B.R. 375, 387 (S.D. Fla. 2004) ("[W]hen a person *who is subject to a trust claim* commingles the trust funds with funds of his own, and funds are subsequently dissipated, he is presumed to first dissipate his own funds rather than funds held in trust, such that the funds is presumed to be those held in trust." (emphasis added)). This means the Court must first decide whether to impose a constructive trust. The Government, however, breezes past this preliminary issue. It offers no reason to impose a constructive trust on the joint checking account in the first instance. Nor does it cite any case in which a court has imposed a constructive trust at the asset freeze stage. The Government seems to use the rules to justify imposing the constructive trust, which is putting the cart before the horse. Without the constructive trust, the Government does not benefit from the presumptions of the lowest intermediate balance rule and the replenishment rule. And without the presumptions, it cannot trace funds from any alleged fraud to the joint checking account to justify freezing that asset as the Eleventh Circuit has directed. Consequently, the Court denies the Government's motion to reinstate the asset freeze as to Robert and Olga's joint checking account.

### 2. *Home*

Next, the Government argues that Robert and Olga used $320,000 of tainted funds "directly traceable" to Defendants' deceptive conduct for the down payment on their home. (Doc. 194 at 3). It gives two checks and a wire transfer from Vylah Tech to Heights Title Service between September 25, 2016 and November 18, 2016. These documents show the following:

On August 1, 2016, Electronic Merchant Systems, a third-party processor, released $10,146.58 into Tech Logic's merchant deposit/business checking account ending 7679 after it stopped processing services with Tech Logic. (Doc. 194-1 at ¶ 8). On September 23, 2016, Tech Logic's account transferred $10,000 to Vylah Tec's business checking account ending 7636. Two days later, Vylah Tec wrote a $10,000 check to Heights Title Service from the same account. (*Id.*; Doc. 194-3).

From January 2016 to November 2016, Express Tech's merchant deposit/business checking account transferred $1.46 million into Vylah Tec's business checking account ending 2196. (Doc. 194-1 at ¶ 5). On November 10, 2016, Vylah Tec's account ending 2196 wrote a $10,000 check to "Hights Title Service" [sic]. (Doc. 194-2 at 4). Two days later, the same account wired $303,351.13 to Heights Title Service "FROM ROBERT CUPO FOR CUP/BOURK CLOSING." (Doc. 194-1 at ¶ 6; Doc. 194-2 at 3; Doc. 194-4).

Defendants' evidence offers a different narrative on the money used for the down payment. Defendants explain that Vylah Tec has multiple, significant revenue streams unrelated to the claims in the Complaint. (Doc. 195 at 9-10). From there, they assert, "the funds used as a down payment on the Cupo's house came—not from the merchant accounts or associated checking accounts that received credit card revenue about which Plaintiffs complain—but from the Vylah Tec account, which received substantial unchallenged revenue[.]" (*Id.*) And from August 2016 to November 2016 alone, Avanquest deposited $208,189.80 into Vylah Tec's account ending 2196, which is an account that wrote a check and wired money to Heights Title Company. (Doc. 194-2 at 3-4; Doc. 195-10 at 17-18). And, since 2014, Avanquest paid Vylah Tec over $1.3 million.

(Doc. 195-10 at 18).   Defendants highlight the Avanquest money because the Government does not allege it was fraudulently obtained.

The Government has no rebuttal to Defendant's Avanquest money.  The Government relies on the checks Vylah Tec wrote to Heights Title Company and declares victory without providing any meaningful explanation or analysis.  (Doc. 192 at 8 ("[F]unds subject to a freeze must be 'a reasonable approximation of a defendant's ill-gotten gains.'")).  In some cases, it may be enough for the Government to rely on a defendant's entire business and/or income stream as fraudulently obtained.  But that is not the case here.  Based on the evidence before the Court, Defendants have valid income separate from the deceptive practices alleged in the Complaint.  The Court thus declines the Government's conclusory position that, because Vylah Tec wrote checks to Heights Title Company, Robert and Olga's home must have used tainted money for the down payment.  The Government needed to show more, and it did not.[5]  The Government offers only its words that Robert and Olga's home "is directly traceable from tainted Vylah Tec funds and should be frozen."  (Doc. 194 at 3).  The Court thus declines to freeze this joint asset.  And because the Court will not freeze the home, it need not decide whether Florida's Homestead Exemption applies to the property.

In conclusion, the record shows that Olga was not involved in the deceptive scheme, and the Government offers no valid justification to freeze her joint assets with Robert.  The Court thus denies the Government's motion.

_____

[5] Missing from the Government's argument is a forensic accounting analysis that traces Defendants' bank accounts to the down payment.  It is not this Court's job to perform the forensic accounting, and even if it was, the Government did not give this Court the full records to do so.

## C. Conclusion

The Court denies the Government's motion after careful consideration of the record, parties' arguments, and applicable law. In denying the motion, the Court understands the Government has a light burden for an asset freeze. But the light burden goes to approximating Defendants' ill-gotten gains, which no party disputes is around $1.8 million. *See Contorinis*, 743 F.3d at 305 ("The amount of disgorgement ordered need only be a reasonable approximation of profits casually connected to the violation"). The Government cannot bootstrap that burden to the other factual findings the Eleventh Circuit has mandated here. The Court also understands that Defendants' assets do not cover their alleged ill-gotten gains. And driving most of the Government's arguments is its desire to preserve money for disgorgement and restitution should it win this suit. Although the Court sympathizes with the Government's concern that Dennis will dissipate his assets, and Robert and Olga will do the same, the Eleventh Circuit's decision binds this Court.[6] And the Court cannot bend the record to make factual findings to fit the Government's position.

Accordingly, it is

**ORDERED:**

(1) Plaintiffs Federal Trade Commission and State of Florida's Motion to Reinstate the Freeze Over Assets Jointly Held by Robert and Olga Cupo and Assets Held by Dennis Cupo (Doc. 194) is **DENIED**.

---

[6] The Government admits that Dennis has negligible assets but that it does not know all his assets. (Doc. 235 at 5:20-6:4). The Government not knowing Dennis' assets at this late stage is disconcerting when this case has been pending for more than a year and it has completed discovery.

(2) Defendants' Renewed and Amended Motion to Unfreeze Individual Defendants' and Non-Party Assets and Credit (Doc. 203) is **DENIED without prejudice**. Defendants may refile, if needed, a motion consistent with this Opinion and Order after meeting and conferring with the Government in a good faith effort to resolve the matter.

**DONE and ORDERED** in Fort Myers, Florida on this 11th day of September 2018.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: Parties of Record