# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

_____

| | |
|---|---|
| Federal Trade Commission and State of Florida, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 2:17-0228 |
| | ) |
| Vylah Tec, LLC, Express Tech Help, LLC, | ) |
| Tech Crew Support, LLC, Angelo Cupo, and | ) |
| Robert Cupo, | ) |
| | ) |
| Defendants. | ) |

_____ )

## DEFENDANTS' POST-TRIAL BRIEF AND
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the Court's order, dated March 8, 2019, Defendants Vylah Tec, LLC; Express Tech Help, LLC; Tech Crew Support, LLC; Angelo Cupo; and Robert Cupo (collectively, "Defendants" or "Vylah Tec") file the below post-trial brief along with proposed findings of fact and conclusions of law attached as Appendix A.

i

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

I.   OUTSTANDING ISSUES BEFORE THE COURT .................................................... 2

II.  LEGAL STANDARD: THE GOVERNMENT'S BURDEN ............................................ 3

III. THE GOVERNMENT'S FAILURE TO USE VYLAH TEC'S RELIABLE AND AVAILABLE
RECORDS IS FATAL TO THE GOVERNMENT'S MONETARY DEMAND. .............................. 6

   A.  The Government bears the burden, not Vylah Tec. ..................................... 6

   B.  Better records were available ................................................................ 8

      1.  The Receiver's testimony .............................................................. 8

      2.  Shelby Alverson's testimony ........................................................ 11

      3.  Rebecca Maturo's testimony ........................................................ 13

   C.  The Government should have used the data available to it to determine a reasonable
   approximation. ...................................................................................... 16

IV.  THE GOVERNMENT FAILED TO PRESENT THIS COURT WITH A REASONABLE
APPROXIMATION OF ITS MONETARY DEMAND. .............................................................. 17

   A.  A reasonable approximation of unjust enrichment must be fair and practical. ............ 18

   B.  Emil George's calculation is error-ridden and the Court cannot trust it. ...................... 19

      1.  The process Mr. George used to determine gross receipts was inappropriate because
      better source data was available. .......................................................... 19

      2.  The record is clear that Mr. George's gross receipts calculation suffers many
      execution errors and is thus unreliable. ................................................... 21

         (a)  Mr. George failed to include obvious chargebacks and refunds in his gross
         receipts calculation. ..................................................................... 21

         (b)  Mr. George arbitrarily treated identical transaction descriptions differently. .. 22

         (c)  Mr. George applied assumptions and guesswork, some inconsistently or
         contrary to law, in his gross receipts calculation. ............................... 24

      3.  The gross receipts calculation impermissibly includes monies owned by a non-
      defendant. ........................................................................................ 25

      4.  Plaintiffs' discovery failures have foreclosed the possibility of a full evaluation of
      the Government's monetary demand. ....................................................... 26

      5.  The Government's attempt to cure its error with tax forms fails. ..................... 28

V.   THE GOVERNMENT FAILED TO MEET ITS BURDEN AND IS NOT ENTITLED TO A MONETARY
AWARD. ......................................................................................................... 28

   A.  This Court should enter an award of zero dollars. ....................................... 29

   B.  An alternative amount of $4,804.83 may also be appropriate. ....................... 30

   C.  No award should or can exceed the amount in the Receivership accounts. ................ 32

VI.   DEFENDANTS MOVED UNDER RULE 26 AND 37 TO STRIKE THE PLAINTIFFS' MONETARY DEMAND. .......................................................................................................................... 33

   A.   The Government violated Rule 26's affirmative-disclosure requirements. ................. 33

   B.   Plaintiffs also violated Rules 30 and 37 by failing to answer questions during the 30(b)(6) depositions. ................................................................................................. 35

VII.   THE FTC ACT DOES NOT PERMIT MONETARY RELIEF. ..................................................... 36

VIII.   SECTION 13(B) OF THE FTC ACT DOES NOT APPLY TO ACTIVITY WHOLLY IN THE PAST AND PROVIDES NO AUTHORITY FOR THE GRANT OF ANY MONETARY AWARD RELATING TO POP-UPS…. ................................................................................................................................ 39

IX.   ADDITIONAL MONEY AWARDED TO THE GOVERNMENT WOULD BE UNCONSTITUTIONALLY EXCESSIVE UNDER THE EIGHTH AMENDMENT. .......................................................... 41

   A.   An additional award to the Government would be an unconstitutionally ruinous fine. 42

   B.   The spirit of equity counsels against further punishment. ........................................... 44

CONCLUSION ............................................................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Commodity Futures Trading Comm'n v. Sidoti*,
178 F.3d 1132 (11th Cir. 1999) ..................................................................3, 4

*Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp.*,
531 F.3d 1339 (11th Cir. 2008) .......................................................................3

*Design Strategy, Inc. v. Davis*,
469 F.3d 284 (2d Cir. 2006).............................................................................31

*Fed. Trade Comm'n v. AMG Capital Mgmt., LLC*,
910 F.3d 417 (9th Cir.) (O'Scannlain, J., concurring)...........................32, 38, 39, 42

*Fed. Trade Comm'n v. Bishop*,
425 F. App'x 796 (11th Cir. 2011) ....................................................................4

*Fed. Trade Comm'n v. DirecTV, Inc*.,
No. 15-01129, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018) ...................16, 17, 31

*Fed. Trade Comm'n v. Gem Merch. Corp.*,
87 F.3d 466 (11th Cir. 1996) ...........................................................................37

*Fed. Trade Comm'n v. Hornbeam Special Situations, LLC*,
No. 17-3094, 2018 WL 6254580 (N.D. Ga. Oct. 15, 2018) .......................36, 37, 40

*Fed. Trade Comm'n v. Johnson*,
96 F. Supp. 3d 1110 (D. Nev. 2015) .................................................................16

*Fed Trade Comm'n v. RCA Credit Servs., LLC*,
727 F. Supp 2d 1320 (M.D. Fla. 2010).............................................................7, 8

*Fed. Trade Comm'n v. Shire ViroPharma*,
917 F.3d 147 (3d Cir. 2019).............................................................................40

*Fed. Trade Comm'n v. Verity Int'l, Ltd.*,
443 F.3d 48 (2d Cir. 2006)...................................................................... *passim*

*Fed. Trade Comm'n v. Vylah Tec, LLC*,
328 F. Supp. 3d 1326 (M.D. Fla. 2018).........................................................5, 33

*Fed. Trade Comm'n v. Vylah Tec, LLC*,
727 F. App'x 998 (11th Cir. 2018) .................................................................3, 38

iv

*Fed. Trade Comm'n v. Wash. Data Res.*,
   704 F.3d 1323 (11th Cir. 2013) ............................................................3

*Fed. Trade Comm'n v. Williams, Scott & Assocs., LLC*,
   679 F. App'x 836 (11th Cir. 2017) ......................................................4

*Goldstein v. Manhattan Indus., Inc.*,
   758 F.2d 1435 (11th Cir. 1985) ..........................................................33

*In re Infant Formula Antitrust Litig., MDL 878 v. Abbott Labs.*,
   72 F.3d 842 (11th Cir. 1995) ..............................................................26

*J.I. Case Co. v. Borak*,
   377 U.S. 426 (1964).............................................................................38

*Kokesh v. Securities & Exchange Commission*,
   137 S. Ct. 1635 (2017)..........................................................38, 39, 41

*Mason v. Ford Motor Co.*,
   307 F.3d 1271 (11th Cir. 2002) ..........................................................33

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*,
   No. 13-80371, 2015 WL 11251736 (S.D. Fla. July 29, 2015)............34

*O'Brien v. NCL (Bahamas) Ltd.*,
   No. 16-23284, 2017 WL 6949261 (S.D. Fla. Oct. 13, 2017) ..............34

*Porter v. Warner Holding Co.*,
   328 U.S. 395 (1946).............................................................................37

*Scales v. Mem'l Med. Ctr. of Jacksonville, Inc.*,
   690 F. Supp. 1002 (M.D. Fla. 1988) ...................................................38

*Talib v. SkyWay Commc'ns Holding Corp.*,
   No. 05-282-T-17, 2005 WL 8160176 (M.D. Fla. Apr. 5, 2005)..........38

*Timbs v. Indiana*,
   139 S. Ct. 682 (2019)......................................................39, 41, 42, 44

*United States v. Bajakajian*,
   524 U.S. 321 (1998).............................................................................42

*United States v. Dish Network LLC*,
   75 F. Supp. 3d 916 (C.D. Ill. 2014) ....................................................16

*Water v. HDR Eng'g, Inc.*,
   No. 08-2446, 2011 WL 13176484 (M.D. Fla. May 11, 2011)..............31

*Wilcox v. Green Tree Servicing, LLC*,
   No. 14-1681-T-24, 2015 WL 2092671 (M.D. Fla. May 5, 2015) ..........................................26

*State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*,
   777 S.E.2d 176 (S.C. 2015) .....................................................................................43

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017) ......................................................................................37, 38

*In re Zyprexa Prods. Liab. Litigation*,
   671 F. Supp. 2d 397 (E.D.N.Y. 2009) ...........................................................................43

**Statutes**

Fla. Stat. § 768.74(5)................................................................................................33

FTC Act Section 13(b), 15 U.S.C. § 53(b) ................................................................. *passim*

FTC Act Section 19, 15 U.S.C. § 57b..........................................................................37

**Other Authorities**

Eighth Amendment .................................................................................................44

Black's Law Dictionary ............................................................................................18

Cambridge Academic Content Dictionary....................................................................18

Federal Rule of Civil Procedure 26 ...................................................................... *passim*

Federal Rule of Civil Procedure 30(b)(6) .................................................................33, 35

Federal Rule of Civil Procedure 37 ....................................................................33, 34, 36

Federal Rule of Civil Procedure 52 ............................................................................29

U.S. Const. amend VIII............................................................................................41

# INTRODUCTION

The Federal Trade Commission ("FTC") and the State of Florida ("Florida") (collectively, "the Government" or "Plaintiffs") have failed to present a reasonable approximation of their monetary demand. They refused to use Vylah Tec's reliable sales records to perform the equitable tracing required by law—and failed to trace a single dollar to alleged wrongdoing. Instead, they presented an untrustworthy "simple" calculation, rife with systemic errors and based on hidden, non-replicable assumptions. In its opening statement, seeking to create the impression of exactitude, the Government told this Court that its monetary award witness Emil George "evaluated everything," and added that "[a] good fisherman will examine everything caught in his net; but he knows what to keep, and he knows what to throw out." Tr.[1] 8:24–9:1. The Government's "net" analogy is revealing because it suggests the opposite of what the law of equity requires. Equity demands tracing, which is more akin to fly fishing, where the target must be carefully identified and sought. The Government must identify revenue, trace it to challenged activity, and build a reasonable approximation based only on wrongdoing before it can claim anything. It cannot simply cast a net around an entire company and demand to have it all no matter what is in the net.

The Government's discovery abuses should also preclude any monetary award. The Government refused to reveal its case until trial and improperly withheld records and answers in violation of Federal Rules of Civil Procedure 26 and 30. The Government deprived Defendants of the ability to mount a full defense, and under Federal Rule of Civil Procedure 37, the Court should strike the Government's monetary demand and end the case there.

---

[1] Defendants use "Tr." to refer to the collected transcripts of the trial held in this matter. ECF Nos. 391, 376, 383, 381, 392, 384, 386.

Section 13(b) of the FTC Act does not give the Government the authority to seek monetary awards—it only grants the authority to seek an injunction. The Government's demand is thus not authorized by statute. Section 13(b) of the FTC Act only applies to ongoing or imminent conduct, but the Government here seeks a monetary award for activity it concedes ended years ago. Finally, the award the Government seeks would ruin Defendants, claiming millions in future, unrelated income. The Government has already destroyed Defendants' livelihoods. Any additional award would violate the Excessive Fines Clause of the Eighth Amendment, which the Supreme Court recently explained is incorporated against the States.

These errors and abuses by the Government are impermissible and contrary to law. Each, standing alone, would be enough to find that the Government has failed to meet its burden. Combined, they are devastating to the Government's case, and collectively should be fatal to its monetary demand. The Government did minimal work to assert the highest amount of unjust enrichment possible. It then concealed the "why" and "how" of that work until trial to prevent Defendants from challenging its case. The Government deliberately chose this strategy, and the Government alone should bear the consequence of its choice.

## I.   OUTSTANDING ISSUES BEFORE THE COURT

- Defendants' Motion Pursuant to Rules 26, 30, and 37 to Hold Plaintiffs' to their Answers or Non-Answers During Discovery and Rule 30(b)(6) Depositions. *See* Tr. 396:11–398:13.
- Defendants' Rule 52(c) Motion for a Judgment of Zero Dollars. *See* Tr. 398:20–412:14. Defendants renewed this motion at the close of their evidence. *See* Tr. 505:23–506:1.
- Receiver's Application for Receiver's Fees and Expense Reimbursement and for Attorneys' Fees and Expenses. ECF No. 303.
  - Defendants filed an opposition to the application. *See* ECF No. 312.
  - The Receiver filed a reply to Defendants' opposition. *See* ECF No. 314.
- Defendants' Motion in Limine to Exclude Plaintiffs' Expert. ECF No. 275 (*Daubert* Motion).

## II.    LEGAL STANDARD: THE GOVERNMENT'S BURDEN

If the Court finds that a monetary award is a lawful and appropriate remedy, then the Government bears the burden of presenting a reasonable approximation of unjust enrichment. Limitations apply: to be a form of equitable relief rather than legal damages, a monetary award must be traceable from the challenged, unlawful conduct to the funds it seeks.

The Government bears "the burden of proving the disgorgement figure reasonably approximates the amount of unjust enrichment." *Commodity Futures Trading Comm'n v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999). "[T]he reasonableness of an approximation varies with the degree of precision possible." *Fed. Trade Comm'n v. Verity Int'l, Ltd.*, 443 F.3d 48, 68–70 (2d Cir. 2006).[2] The Eleventh Circuit already has ruled in this case that disgorgement must be based on what Defendants gained from "allegedly unlawful practices." *Fed. Trade Comm'n v. Vylah Tec, LLC*, 727 F. App'x 998, 1002 (11th Cir. 2018) (citing *Sec. & Exch. Comm'n v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014) ("Because disgorgement does not serve a punitive function, the disgorgement amount . . . may not exceed the amount obtained through wrongdoing.") (internal citations and quotations omitted)). The FTC must first meet that burden before it can shift the burden of proof to Defendants on rebuttal. *See Verity Int'l, Ltd.*, 443 F.3d at 68–70 (finding that "the amount of the defendant-appellants' *unjust* gains is only a fraction of the amount of their overall gains from the billing system").

Any presumption against Defendants based on records uncertainty only kicks in *once the burden has shifted to them*, and not before. *Id*. at 69 ("This presumption against the wrongdoer

---

[2] The Eleventh Circuit has relied on *Verity* several times. *See, e.g.*, *Fed. Trade Comm'n v. Wash. Data Res.*, 704 F.3d 1323, 1326 (11th Cir. 2013); *Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1345 (11th Cir. 2008) (quoting *Verity* as saying "the appropriate measure for restitution is the benefit unjustly received by defendants").

should not have been invoked without first establishing a reasonable approximation of unjust gain because this presumption applies only in the second stage of the burden-shifting framework."). And this risk only applies when Defendants' "'illegal conduct created the uncertainty.'" *Id*. at 69 (citation omitted).

The Government must trace the money it seeks to alleged wrongdoing. "'[T]he district court should keep in mind the limitation placed on its equitable powers by this requirement that there be a relationship between the amount of disgorgement and the amount of ill-gotten gain.'" *Sidoti*, 178 F.3d at 1138 (quoting *Commodity Futures Trading Comm'n v. Am. Metals Exch. Corp.*, 991 F.2d 71, 79 (3d Cir. 1993)). The Eleventh Circuit is clear that "the district court may not disgorge profits obtained without the aid of any wrongdoing." *Id*. (citing *Sec. & Exch. Comm'n v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989) ("Since disgorgement primarily serves to prevent unjust enrichment, the court may exercise its equitable power only over property causally related to the wrongdoing[.]")). And "the disgorgement amount must be limited to the time frame for which the party seeking the disgorgement presented evidence of the defendant's bad acts." *Fed. Trade Comm'n v. Williams, Scott & Assocs., LLC*, 679 F. App'x 836, 840 (11th Cir. 2017) (citing *Sidoti*, 178 F.3d at 1137–38). This remedy exists only to "deprive the defendant of his ill-gotten gains; these equitable remedies do not take into consideration the plaintiff's losses." *Fed. Trade Comm'n v. Bishop*, 425 F. App'x 796, 798 (11th Cir. 2011). While "'[e]xactitude is not a requirement[,]'" the FTC still bears the burden of showing "'a reasonable approximation of a defendant's ill-gotten gains.'" *Id*. (citation omitted).

Throughout this case, Florida has made clear that it is seeking the exact same equitable award as the FTC. *See, e.g.*, Fla.'s Reply in Supp. of Mot. for Summ. J. at 2 [hereinafter Fla.'s Reply], ECF No. 308 ("The two agencies are seeking identical equitable relief[.]"); *id.* at 4–5 ("Co-

4

Plaintiffs seek the same relief . . . The Attorney General is properly seeking equitable relief equal to the amount of Defendants' ill-gotten gains."); *see also* Fla.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. at 10, ECF No. 304. Florida also has conceded that the FTC Act is "a federal statute to which Florida's courts must look when interpreting FDUPTA,"[3] Fla.'s Reply at 6, and it has sought to differentiate this case from one seeking damages, arguing that "[s]eeking restitution is not a request that the court . . . award statutory damages" and later adding, "courts around the country have held that 'equitable relief' in the consumer-protection context includes restitution and disgorgement, as distinct from actual damages." Fla's Reply at 6 (internal quotation marks and citations omitted). Thus, Florida's prayer for relief is equally subject to the strict constraints of the law of equity, such as tracing.

Earlier in this case, the Government moved to re-institute an asset freeze on certain of Defendants' assets. This Court ruled that the Government needed to trace those assets in order to claim them: "The Government cannot bootstrap that burden to the other factual findings the Eleventh Circuit has mandated here[,]" and "the Court cannot bend the record to make factual findings to fit the Government's position." *Fed. Trade Comm'n v. Vylah Tec, LLC*, 328 F. Supp. 3d 1326, 1340 (M.D. Fla. 2018). This Court found that Plaintiffs did no forensic accounting analysis and thus had no right to the desired asset freeze. *Id*. at n.5 ("Missing from the Government's argument is a forensic accounting analysis that traces Defendants' bank accounts to the down payment. It is not this Court's job to perform the forensic accounting, and even if it was, the Government did not give this Court the full records to do so."). That same law of the case applies here: no proper accounting and no tracing should result in no award.

---

[3] FDUPTA stands for "Florida's Deceptive and Unfair Trade Practices Act."

To receive any monetary award, the Government must satisfy the above requirements and then trace the funds it seeks to allegedly unlawful activity. First, it needs to show that the award amount is traceable to conduct the Government challenged in its complaint and for which the Court found liability. Second, it needs to show that the traceable amount is reasonably approximated. Finally, it must trace the demand to identifiable funds. If it fails at any step, then it has not met its burden and cannot receive any award.

## III. THE GOVERNMENT'S FAILURE TO USE VYLAH TEC'S RELIABLE AND AVAILABLE RECORDS IS FATAL TO THE GOVERNMENT'S MONETARY DEMAND.

The Government could have used Vylah Tec's sales data to construct a reasonable approximation of alleged unjust enrichment. The entries in three distinct databases—Authorize.net, Five9, and VTiger—arose directly from sales transactions, created as each sale occurred to effectuate the transaction. The Government's strategic decision to avoid this available, contemporaneous data and best evidence should be fatal to any monetary demand.

### A. The Government bears the burden, not Vylah Tec.

Vylah Tec kept reliable sales records. The Receiver and Shelby Alverson both testified to the reliability and firm foundation of those records, which would have allowed the Government to trace revenue through all steps of the sales process, from the original sales transaction to the final repository of funds—as required by law. Once the Government raided Vylah Tec's offices, it had access to these critical records. *Infra* § III(B)(1). These records would have allowed the Government, and ultimately, this Court, to identify dollars associated with challenged sales and exclude transactions that are unrelated to the allegations in the Complaint or any finding of liability. *Infra* § III(C). But the bank records the Government instead chose to use do not permit such granularity. *Infra* §§ III(B), IV(B)(1). Moreover, as discussed below, those bank records are

highly aggregated and obscure critical information, such as the number of sales transactions included in each bank deposit and what they were for. *Id.*

The Government attempts to defend its failure to use sales data by inverting the law to argue that *Defendants* bear the burden of records uncertainty. First, the Government claims that Defendants "need to . . . rebut" the Government's calculation. Gov't's Pre-Trial Br. at 1, ECF No. 360. Second, it claims that no better information was available. *See id.* Third, it attempts to place the blame for its own strategic choice of which records to use on Vylah Tec, alleging that Vylah Tec somehow created "uncertainty." *Id.* (citing *Fed Trade Comm'n v. RCA Credit Servs., LLC*, 727 F. Supp 2d 1320 (M.D. Fla. 2010)).

Each of these assertions is untrue and contradicted by the record. First, the Government is incorrect to assert that Vylah Tec must rebut its calculation. The Government must first show that its approximation is reasonable before any burden of proof shifts to Defendants. *Verity*, 443 F.3d at 68–70. The Government has failed to do so, and its claim that Vylah Tec must provide a better or alternative calculation is wrong. *See* Gov't's Pre-Trial Br. at 12.

Second, a case the Government cites, *RCA*, stands for an important point by implication: if quality records are available, the Government must use them. *RCA* holds that "[t]he calculation may be properly based on estimates because sometimes that is the only information reasonably available[,]" later adding "[t]he absence of information does not automatically mean that the Commission's calculations are not reliable.'" *RCA*, 727 F. Supp. 2d at 1337 (internal quotations and citations removed). This holding is limited to a specific instance in which no better information was available, the clear implication being that where better information is available, the Government must use it.

Third, *RCA* specifies that "'[t]he risk of uncertainty should fall on the wrongdoer *whose illegal conduct created the uncertainty.*'" *Id.* (citing *Fed. Trade Comm'n v. Febre*, 128 F.3d 530, 536 (7th Cir. 1997) (emphasis added)). And *Verity* holds that this presumption against uncertainty only applies after the Government first presents a reasonable approximation and shifts the burden—which it has not here. *Verity Int'l, Ltd.*, 443 F.3d at 68. Defendants' alleged "illegal conduct" did not contribute to records uncertainty. As explained below, Vylah Tec's records were thorough and reliable, and there is no evidence that Vylah Tec did anything to obscure the records of its sales. The testimony of numerous witnesses, also outlined below, powerfully demonstrates that quality records *were available* and maintained by Defendants. If, as *RCA* says, the lack of information does not "automatically" mean the Government's calculations are unreliable, then, by implication, the *existence* of the reliable information *not used by the Government* should mean that its calculations are unreliable. *RCA*, 727 F. Supp. 2d at 1337. The Government's failure to use the records in Authorize.net, Five9, and VTiger is fatal to its monetary demand.

### B.      Better records were available

The testimony of the Receiver, Shelby Alverson, and Rebecca Maturo show that better records were available to the Government and that the Government had the ability to use them.

#### 1.      The Receiver's testimony

The Defendants kept records in at least four methods: Authorize.net, V-Tiger, Five9, and the V-Tec Dailies.[4] During direct examination, the Receiver testified that he found the V-Tec Dailies to be "reliable in terms of the base information[.]" Tr. 36:25–37:1. The "base information" he found reliable was drawn from various sources, including Authorize.net, Five9, and VTiger, which he described as a customer relations management database. Tr. 37:12–13. During cross, the

---

[4] The V-Tec Dailies summarized some of the other records.

Receiver clarified that when he testified during a deposition that the Defendants "were very good at logging in their sales[,]" Tr. 63:7–8, he was referring to data they kept to "track the effectiveness of what they were selling and what they were doing; how many calls they were getting in, and what their volume was." Tr. 64:1–4.

The Receiver testified that Authorize.net is a "merchant gateway" that "administers credit card transactions" and "acts as a liaison between the bank, the credit card companies, and the company." Tr. 64:13–18. He explained that Authorize.net maintains and keeps "[t]he customer name, customer address, credit card information, the product that's being sold, the date that it's being sold, whether the credit card's been accepted or rejected, the time that it was settled, the time of the sale, all the information being entered by Vylah Tec into the computer system that's on Authorize.net." Tr. 65:17–22. He later added that Authorize.net even tracked whether certain charges were recurring or non-recurring. Tr. 67:7–8. Critically, the Receiver testified that these records would allow the government to know *which products* Vylah Tec sold to each consumer. Tr. 66:6–8.

On the day of the "takedown" of Vylah Tec's offices, as the Receiver called it, he gained access to the Authorize.net database. Tr. 74:9–20. A few days later, he changed the password, Tr. 76:13–25, and began to download the Authorize.net "data[.]" Tr. 77:7–19. Plaintiffs had full access to this data. On May 9, 2015, the Receiver changed the email address on the Authorize.net database. Tr. 80:16–20. On the same day, the Receiver emailed Robin Rock, counsel for the FTC, attaching "the data we mined from Authorize.net." Tr. 68:14–69:6; *see* DX-N. At trial, the Receiver clarified that this referred to the data from 2016 and 2017, but that he had not transferred the data from 2015. Tr. 69:19–71:22. Authorize.net indicated it did have the 2015 data in an

9

archive. Tr. 96:14–17. The Receiver, when asked if the pre-2016 data existed, answered: "I assume it does." Tr. 96:23–25.

The Receiver did further analysis of the Authorize.net data, identifying recurring billings, and, on October 23, 2017, transferred this information to the FTC. Tr. 83:4–10. Throughout his testimony, the Receiver made one point abundantly clear: "I provided any information that any party asked me for . . . If there was a request for documents or information specifically, I provided it." Tr. 83:9–12; *see* Tr. 85:19–20. ("Anytime anybody asked for information from my office, *everything* was provided.") (emphasis added).

The Receiver also testified to the type of data available in VTiger, the customer relationship management database. Tr. 97:3–4. It included records of interactions with customers, what the customer said, and other information. Tr. 97:6–17. Vylah Tec's employees were instructed to populate the database. Tr. 97:18–20. Finally, the Receiver testified that another service, Five9, contained information on call records and call volume. Tr. 98:11–13. Five9 also retained audio recordings of customer calls. Tr. 98:5–7. The Receiver preserved the records for both databases. Tr. 97:22–98:4 (VTiger—also indicating the VTiger account is still active), 98:11–17 (Five9).

The Receiver's only reservation about Authorize.net, V-Tiger, and Five9 was his speculation that these third-party, password-protected databases might somehow be manipulated. *See, e.g.*, Tr. 78:13–15. But, as he repeatedly testified, there is no evidence—zero—that these databases were ever manipulated.[5] Tr. 78:16–18 ("Q. Do you have any reason to believe that it was manipulated? A. No."), 98:23–25 ("Q. Do you have any evidence that any database in this case has been manipulated? A. No[.]"). The Receiver himself uses third-party software to keep the

---

[5] And there is no evidence in the record to suggest manipulation.

financial records at his business. Tr. 79:23–80:2. And he testified that other businesses commonly use third-party vendors for recordkeeping purposes. Tr. 116:25–117:4.

The Receiver also testified to the aggregated nature of bank records. When asked whether one could trace the sale of a product to a specific dollar using bank records, the Receiver adamantly answered no, explaining "once cash goes into a bank, it's commingled, and there is no separate identification of source and use of funds by product line." Tr. 109:8–11. This tracks Emil George's testimony, in which he conceded that the bank records would not allow him to evaluate individual sales transactions. *See infra* § IV(B)(1). Yet the Receiver conceded that it was possible to trace sales made on the over sixty calls the Government identified to their entries on the Authorize.net database. Tr. 114:21–115:9. And in a comparison between bank records and Authorize.net, the Receiver made it clear which database allowed tracing: Authorize.net.

> Q Didn't you testify earlier that in -- for instance, in the Authorize.net database, it had the software sold, the customer name, price, isn't that correct?
>
> A Sure; but once [it] hits a bank account, it's commingled with everything else, so it loses its character.

Tr. 109:16–20. And that is the key. Tracing was only possible using records of sales *before* the money hit the bank accounts, not after. Those records were in Authorize.net.

### 2.   Shelby Alverson's testimony

Shelby Alverson worked at Vylah Tec first as a Tier 3 technical support agent, then as an administrative assistant, and finally as an administrator. Tr. 420:7–25, 422:23–433:20. Ms. Alverson called Vylah Tec an "honest business" and testified that she saw nothing during her time there that would have made a law enforcement shutdown appropriate. Tr. 462:18–21. Ms. Alverson shared with the Court how much she enjoyed her job and the work she did, stating that it "used [her] skill-sets, challenged [her] but yet allowed [her] to accomplish a lot." Tr. 464:3–6. One of her key duties was quality assurance, which included evaluating individual calls to ensure that

Vylah Tec was "keeping the standards as high as they needed to be for our customers. If we were doing something that the customers did not approve of, they would tell us." Tr. 438:18–21. She also evaluated potential new products to make sure they were a "reputable piece of software" and to answer key questions, such as "[d]id it cover what our customers needed, did it cover protection, did it cover scans, did it cover what we were expecting to provide our customers." Tr. 440:13–19. She demonstrated to the Court how she would evaluate calls and rate them on a color system, flagging problematic calls for further review by management. *E.g.*, Tr. 446:15–451:15.

As part of her work, she tracked sales and created sales reports. Tr. 423:23–424:14, 425:2–9 (GX-4A), 429:3–6 (GX-5A). During cross-examination, Ms. Alverson testified to the granularity of the data available in Authorize.net. Authorize.net contained customer names, *e.g.*, Tr. 484:24–485:6; the frequency with which *individual customers* made purchases from Vylah Tec, including on recurring billings, Tr. 485:7–12; and the settlement dates for each unique purchase. Tr. 486:18–487:3. Authorize.net also included the type of product or service sold, Tr. 487:4–13, and maintained the detail of separate transactions, even if consumers made multiple purchases in the same call. Tr. 487:14–24. Ms. Alverson validated and explained a sample output from Authorize.net. Tr. 436:1–10; DX-V. She shared that transactions coded with "general error" were not successful charges. Tr. 484:10–14. She fully demonstrated—during cross-examination—how she could analyze the Authorize.net data, identify a specific consumer, show which product the customer purchased at which date, and determine the value of the sale. Tr. 487:25–489:17.

Any doubt whether the Government had access to the Authorize.net records was shattered during cross-examination when the *Government itself* produced screenshots of report pages of Authorize.net, which Ms. Alverson authenticated. Tr. 491:3–492:14; GX/PX 30, 30, 31. And, importantly, these screenshots reflect Authorize.net reports from 2015, pre-dating the 2016 and

12

2017 data. Tr. 492:13–14; GX/PX-32. Ms. Alverson also revealed a critical fact: Vylah Tec used the Authorize.net database in 2014—unrebutted testimony directly contrary to the assertions made by the Government in its opening statement and pretrial brief. *Compare* Tr. 492:18–24, *with* Tr. 11:12–17; Gov't's Pre-Trial Br. at 8. Ms. Alverson discussed how she could manually match an entry from Authorize.net to the Five9 system, which recorded all the calls. 494:3–13.

### 3.      Rebecca Maturo's testimony

The Government's own employee and witness, FTC Investigator Rebecca Maturo,[6] provided critical testimony. Presumably, the Government presented this witness to show that the type of sale made to its investigator, Michael Liggins[7]—which the Government did not disclose as part of its summary judgment motion, likely because these sales refute the Government's claims—can be analogized only to a specific number of other sales, amounting to $19,803.79. *See* Tr. 511:20–22; GX-33.

Yet, for different reasons, Ms. Maturo's testimony acutely illuminated the failures of the Government. First, it showed that the Government had access to the Authorize.net data and knew how to evaluate it. Second, it revealed that despite that ability, the Government was still at pains to avoid the legally required tracing—choosing instead to deflect the Court's attention to a superficial exercise in summing up sales from a single service offering.

On the stand Ms. Maturo testified that she is familiar with Authorize.net as the credit card gateway used by Vylah Tec. Tr. 507:22–508:2. She testified that she had reviewed an Excel file of data from Authorize.net that included transactions from January 1, 2016 through May 2017,

---

[6] Ms. Maturo testified that she currently works for the FTC, but previously worked on this case for the State of Florida. Tr. 506:18–507:16.

[7] Michael Liggins used the name "Mychal Knights" as his undercover name in the test calls. Tr. 509:21–22. This name was transcribed as Michael Knight in the trial transcript. For ease of reading, Defendants use Michael Knight here.

showing successful transactions, voided transactions, and credited transactions, along with descriptions of the purchases. Tr. 508:2–25.

Ms. Maturo explained how she could, and indeed did, identify the transaction record for Michael Knight in the Authorize.net records. Tr. 509:1–4. Based on the invoice description in that record, Ms. Maturo could search the Authorize.net data and identify transactions for different consumers with a similar service offering to the transaction of Michael Knight.

> Q Did you ever have the occasion to research what Michael Knights purchased from VTec?
>
> A I was able to locate a transaction in the record with that name; yes.
>
> Q Did you ever search for any other types of transactions similar to the Michael Knight transaction?
>
> A I did. I identified what the invoice description was for the Michael Knight transaction, and then I sorted the data by that field to identify other similar transactions that were labeled with the same invoice description.

Tr. 509:1–10. The Government then added up all these sales and presented a figure to the Court. Tr. 511:20–22. Ms. Maturo explained that she used basic Excel functions to identify the relevant records. Having done so, the math was easy.

> Q And how did you determine the dollar amounts?
>
> A Each transaction was its own row, and in addition to the invoice description contained in that row, there was also a purchase price. So once I identified and isolated the relevant transactions, I just totaled the number.

Tr. 510:23–511:2. Ms. Maturo went into detail about how she analyzed the spreadsheet, and the breadth of the information it provided her—which included the product or service offered. Tr. 511:3–514:5, 513:21–24 ("While reviewing the Authorize.net, I noticed most of the transactions . . . well . . . included a description such as a security bundle, or security software, or an unlimited data backup."). Finally, Ms. Maturo conceded that she performed a larger analysis of the Authorize.net data within the "last couple of weeks" before trial. Tr. 515:12–19. But what that

14

analysis revealed remains a mystery. Indeed, continuing the Government's approach of "trial by surprise," Plaintiffs first gave the underlying data on which Ms. Maturo relied to Defendants on the morning of her testimony, the last day of trial. Tr. 515:20–516:3.

Ms. Maturo's testimony proved that the Government could have used Authorize.net to identify sales of specific products or services and thus exclude unchallenged product and services offerings from its calculation. It did so once, on short notice—quickly pulling together for trial an analysis of all service offerings similar to the purchase made by its investigator. It could have, but did not, similarly exclude from its claims all other types of products and services that do not figure in the claims set forth in the Complaint or in the Court's finding on liability. This first step is critical to reaching a sound calculation; but it is only a first step.

What Ms. Maturo's testimony camouflaged is as important as what it exposed. By focusing only on the service that Mr. Liggins purchased, the Government deflected from the real issue: that the calls made by Mr. Liggins included no sales pitch, no use of a script, and no deceptive representation (except by Mr. Liggins), plus an affirmative suggestion by the agent that the customer should discuss the purchase with his daughter before deciding whether to proceed. *See* DX-TA 3:15–20, 4:1–7:10, 9:10–10:1. In addition, the purchase, when made, was initiated by Mr. Liggins—not the Vylah Tec agent. *See* DX-UA 5:10–8:21, 9:1–9:12, 13:1–17:1. These calls represented a different type of call from the calls for which the Court found liability. Because the law limits restitution to "the amount obtained through wrongdoing," any sale for which the Government can identify no wrongdoing must be excluded. The law, therefore, requires a second step in the analysis, which the Government did not do: identifying calls for which liability has been established.

15

**C.      The Government should have used the data available to it to determine a reasonable approximation.**

To identify only those sales for which liability has been established, the Government had several options buttressed by abundant, reliable data. The Receiver testified that, along with Authorize.net, Vylah Tec maintained reliable customer relations management data in VTiger. Tr. 37:12–13. He testified that another service, Five9, contained information on call records and call volume and that Five9 also retained audio recordings of customer calls. Tr. 98:5–7, 11–13. The Receiver preserved the records for both databases. Tr. 97:11–17, 97:22–98:4. Ms. Alverson explained how she could manually match an entry from Authorize.net to the Five9 system. Tr. 494:3–13. Thus, had the Government earnestly sought a lawfully sufficient calculation, it could have made one using the information available.

For example, the Government cannot base its demand on cherry-picked calls that it cannot extrapolate to the general population of transactions. *Fed. Trade Comm'n v. Johnson*, 96 F. Supp. 3d 1110, 1121 (D. Nev. 2015) ("The Court cannot adopt the FTC's approach of using selected examples of claims picked from across the entire universe of the FTC's exhibits, seemingly without a clear methodology, and draw conclusions as to every one of Defendants' sites."); *Fed. Trade Comm'n v. DirecTV, Inc*., No. 15-01129, 2018 WL 3911196, at *15 (N.D. Cal. Aug. 16, 2018) (finding unpersuasive the FTC expert's assertion that selected advertisement was representative of the universe of material at issue). Instead, it could have selected a random sample of sales transactions from either Authorize.net or Five9 and cross-referenced those records to the other database. This would have provided both the sales data—dollars, product, and customer from Authorize.net—and the recording of the sales call. The Government could then analyze the randomly-sampled calls and transactions for challenged behavior and then extrapolate the results to the general population for a statistically valid result. *See United States v. Dish Network LLC*, 75

16

F. Supp. 3d 916, 939 (C.D. Ill. 2014) (finding random sampling methodology reliable under Rule 702.) This may have required the services of a damages expert, but the law requires as much. *DirecTV, Inc*., 2018 WL 3911196, at \*15–16.

This sort of analysis, had the Government properly disclosed it before trial to Defendants, would have been subject to cross-examination and verification due to the detail available in the Authorize.net database and the express assumptions and calculations that the Government should have addressed in an expert report or testimony. The Court would have had a clear look at what does and does not belong in the monetary demand calculation, and traceability in the calculation would be assured. But the Government failed to undertake, let alone disclose, such analysis. Whether the Government intended to avoid the hard work needed to comply with the law or to evade the risk of limiting its claim to a mere subset of the dollars does not matter—the Government failed to do the necessary work and the current calculation is legally infirm. "[T]he reasonableness of an approximation varies with the degree of precision possible." *Verity Int'l Ltd.*, 443 F.3d at 69. Here, there was no record keeping malfeasance by Defendants, and with three record-keeping systems available, the potential degree of precision was high, but the Government deliberately avoided it. The Government's calculation is therefore unreasonable.

## IV. THE GOVERNMENT FAILED TO PRESENT THIS COURT WITH A REASONABLE APPROXIMATION OF ITS MONETARY DEMAND.

The Government's failure to use the correct records should be fatal to its monetary demand. But even if it is not, the Government's haphazard, flawed attempt to use bank records should be. During cross-examination of the Government's accountant, Emil George, it quickly became apparent that all the Government's damages figures were irreparably infected with error, false and undisclosed assumptions, or faulty methodology. The number of errors admitted by Mr. George on the stand reveal a base infirmity with the entire process. The Court cannot trust any of his work.

As this Court recognized about the Government's monetary demand, "it's obvious that there's a moving ballpark[.]" Tr. 186:7–8. Before trial, Plaintiffs offered several differing monetary demands. *See, e.g.*, Omnibus Mots. in Limine at 9–14, 18–19; GX-6; Gov't's Pre-Trial Br. at 4–5; *see generally* Tr. 14:14–15:3 (Defendants' opening statement listing the different demands). At trial, Plaintiffs continued to shift their monetary claim, including soliciting testimony regarding previously undisclosed changes in the calculation. Tr. 183:6–21.

### A.    A reasonable approximation of unjust enrichment must be fair and practical.

Any "reasonable approximation" must be fair and practical and stay within the bounds of equity. *See infra* § V(C). The Cambridge English Dictionary defines reasonable as "based on or using good judgment, and therefore fair and practical[.]" *Reasonable*, Cambridge Academic Content Dictionary, *available at* https://bit.ly/2uehgqL. Black's Law Dictionary defines reasonable as "1. Fair, proper, or moderate under the circumstances; 2. According to reason." *Reasonable*, Black's Law Dictionary (9th ed. 2009). By contrast, the Cambridge English Dictionary defines "arbitrary" as: "based on a desire or idea or chance rather than reason." *Arbitrary*, Cambridge Academic Content Dictionary, *available at* https://bit.ly/2UZHKrO. Thus, any approximation that is arbitrary cannot be reasonable.

During the trial, the Court asked Defendants if Mr. George's work was "close enough for government work." Tr. 411:1. The answer is no. Plaintiffs are government entities with vast resources. In requiring the Government to provide a "reasonable approximation," the courts acted with purpose. The Government's monetary demand, rife with errors and false presumptions, did not derive from "good judgment" nor is it "according to reason." It is instead arbitrary—derived from guesswork and unsupported assumptions. It is not "fair and practical" or "fair, proper, or moderate under the circumstances." Rather, the Government unfairly demands virtually all the money, and then some, *see infra* §§ IV(B)(2)(c), V(B), that Defendants' business ever received.

**B.      Emil George's calculation is error-ridden and the Court cannot trust it.**

The Court cannot trust the "calculation" presented by the Government and its accountant, Emil George.  The Court also is not required to do its own calculation. Over hours of methodical cross-examination, Mr. George, the Government's sole witness on its monetary demand, conceded to over sixty-five errors in his calculations. *See* App. B. These conceded errors are potentially the tip of the iceberg because only the May 2014–June 2015 records for one bank account—the Bank of America account ending -5986 ("BoA -5986" or "GX-7")—faced in-depth examination at trial. The dollar amount of errors from BoA -5986 that Mr. George conceded is four times larger than the total dollar amount of chargebacks and refunds he identified in his calculation for that account.

**1.      The process Mr. George used to determine gross receipts was inappropriate because better source data was available.**

Credit card processor data is the source data for sales transactions. When a customer makes a purchase using a credit card, that purchase goes through the credit card processor. Tr. 226:12–228:4. The credit card processor then deposits aggregated credit card sales into a merchant account. Tr. 226:12–228:4. The merchant account then transfers aggregated deposits into the bank account. Tr. 226:12–228:4. Under this process, the information in the bank statements is twice removed from its source, the credit card processor, and due to multiple aggregations loses key information about the genesis of a deposit. Tr. 229:11–20. Mr. George conceded that using the records he had—the bank statements—he could not distinguish between individual sales transactions. Tr. 228:15–229:20, 233:14–16.

Authorize.net was Defendants' credit card processor for most of the time that Vylah Tec was in operation and provided source data that even the Government's own witness, Ms. Maturo, analyzed to produce a calculation of sales by product. *See supra* § III(B)(3). As evidenced at trial, the Government could have used the Authorize.net records to develop a more precise calculation.

19

*Compare* Tr. 510:9–511:2 (Ms. Maturo tracing a type of sale using Authorize.net records and determining a total dollar amount), *with* Tr. 229:15–230:3 (Mr. George assuming, despite noting the inability to know the purpose of a transaction, that deposits on bank statements were consumer receipts).

But Mr. George only based his calculation on bank records provided to him, Tr. 229:2–10, 243:13–19, despite conceding that the credit card processor data—Authorize.net—is the source data for deposits that end up in the bank accounts and is the initial record of the sales transactions. Tr. 227:20–23, 227:24–228:1. Mr. George did not have the underlying documentation to determine whether transfers into the Vylah Tec checking accounts represented purchases, recurring charges, donations, or some combination thereof. Tr. 232:16–233:6. He could not even tell if a bank statement deposit reflected multiple underlying sales transactions or what type of transaction a bank deposit represented. Tr. 229:11–14, 233:14–16, 229:15–20. Highlighting this issue is the call and purchase made by FTC Investigator Michael Liggins. As discussed above, there is an identifiable purchase made by a non-consumer—the FTC through Mr. Liggins—that Mr. George did not deduct from the Government's monetary demand. He failed to do so because he did not know that the FTC made test calls and thus could not have adjusted his calculation for a transaction that he did not even know existed. Tr. 376:21–24.

Moreover, despite over a year of discovery—including the identification of Authorize.net, V-Tiger, Five9, and the V-Tec Dailies—Mr. George's methodology never changed. Tr. 181:15–182:3. He relied only on bank statements provided by Plaintiffs to complete his calculation. While this may be a deliberate litigation strategy by Plaintiffs, such a strategy is indefensible under the relevant case law. *See supra* § III(A).

### 2.     The record is clear that Mr. George's gross receipts calculation suffers many execution errors and is thus unreliable.

Mr. George asserted that he could recreate his calculation—but his testimony suggests otherwise. Tr. 277:15–20. Mr. George testified that his analysis was the simple summation of consumer receipts less refunds and chargebacks. Tr. 215:19–21. At trial, Defendants identified and explored many categorical errors that refute Mr. George's claim to simplicity and render his gross receipt calculation unreliable.

### (a)     Mr. George failed to include obvious chargebacks and refunds in his gross receipts calculation.

Mr. George claimed that he identified chargebacks on the bank statements. *See, e.g.*, Tr. 170:21–22. But he admitted that he missed items that he should have included in his calculations: chargebacks and refunds. Tr. 181:20–182:3. Many of these were obvious errors, such as overlooking entries, labeled "chargeback." Mr. George was unable to explain bypassing these entries.

On direct examination, while reviewing BoA -5986, Mr. George testified that a transaction on August 26, 2014, which was labeled "chargeback," was "what I was describing as charge-back." Tr. 198:3–16. Under his own methodology, Mr. George should have included all transactions labeled as chargebacks in his gross receipts calculation. Tr. 181:20–182:3 ("I subtracted the chargebacks and the refunds from the consumer receipts to come up with gross receipts."). But the bank records show that he did not include all such transactions.

Mr. George's calculation included zero chargebacks for August 2014. Tr. 220:4–6; 305:24–306:3. But the BoA -5986 August 2014 bank statement includes five transactions, counting the August 26, 2014 transaction, which bear identical "BANK OF AMERICA DES:CHARGEBACK ID:372316799884" descriptions that total $2,000. *See* GX7–17. Mr. George missed all five of the relevant entries. Similarly, as identified in Appendix B, Mr. George

failed to identify and include twenty-three additional transactions between September and November 2014 bearing "BANK OF AMERICA DES:CHARGEBACK ID:372316799884" descriptions, totaling $16,329.99. From August to November 2014, Mr. George missed twenty-eight obvious chargebacks, totaling $18,329.99, and, instead, erroneously found there were zero. Tr. 220:4–15.

In other testimony, Mr. George claimed that he reduced his calculation for any refund that Vylah Tec paid by check, basing his determination on whether the check included the word "refund" in the memo line. Tr. 254:18–255:16. Still, he refused to acknowledge as a refund a check from First Citizens Bank ending in -1635 for $1,100 that he deemed to be illegible, reading it as "R E F. U R D[.]" Tr. 375:15–376:12; *see* DX-FF.[8] Similarly, a check for $75 from First Citizens Bank Account ending in -2196 included the word "refund" but Mr. George did not include it in his total. Tr. 374:8–375:5; *see* DX-EE.

### (b)    Mr. George arbitrarily treated identical transaction descriptions differently.

As identified at trial, the BoA -5986 account, and presumably other accounts, use various descriptions for credits made into and withdrawals (debits) made out of Defendants' corporate accounts. *See* Tr. 247:7–16. Yet Mr. George admitted that he did not know what dozens of entries meant. *See, e.g.*, Tr. 307:8–9 ("INTERCHNG"); Tr. 325:2–5 ("DES: FINCL ADJ"). Nor did he research their meanings. *See* Tr. 325:11–13 ("Q. Did you ever endeavor to find out what that particular transaction means? A. Not that I can recall.").

---

[8] The Government on re-direct tried to fix Mr. George's exclusion of this check by introducing yet another undisclosed assumption: that the check was made to a business and was not included for that reason. *See infra* § IV(B)(4). This is what comes of stonewalling in discovery: trial by surprise.

It remains unknown why he sorted certain transactions in the ways he did. For example, when asked what the entry "MTOT ADJ" represented, he had no idea. Tr. 390:12–15. Yet when MTOT ADJ transactions brought money into the BoA -5986 account, Mr. George *included* them in his calculation as consumer receipts, increasing the dollar value of his result. Tr. 320:20–321:16 (also testifying that he included "MTOT DEP" and "BTOT DEP"). But when MTOT ADJ transactions were withdrawals, Mr. George skipped the entries, avoiding a reduction to his gross receipts calculation. *See* Tr. 349:3–351:17; GX7–77–86 (Mr. George's testimony and a review of the February 2015 BoA -5986 statement suggests that he included seven "MTOT ADJ" credits totaling $2,082.50 in his consumer receipt calculation, but he also failed to include eight "MTOT ADJ" debits totaling $3,099.99 from the account).

Because of time constraints, Defendants were unable to explore all infirmities in Mr. George's calculation. That said, if time had allowed there is no doubt that similar inconsistencies and errors would have emerged. For example, like the BoA -5986 account, the First Citizens Account ending -1635 ("FC -1635" or "GX9") had numerous transactions that include "Mtot Dep" in the description. *See* App. C; *see also, e.g.*, GX9–12 (describing September 21, 2015 withdrawal as "Bankcard Mtot Dep**********0758"). In total, these twenty-one "Mtot Dep" withdrawals add up to over $58,000. *See* App. C. In comparison, Mr. George only calculated $47,432.25 in total chargebacks for the FC -1635 account. *See* GX6. Either Mr. George did not include these transactions in his chargeback calculation, or he only included a portion of them.

As a result, Mr. George included transactions with identical descriptions if they represented credits (additions) but did not include them if they represented debits (reductions). This biased approach maximized the dollar figure by failing to match corresponding transaction descriptions.

(c)     **Mr. George applied assumptions and guesswork, some inconsistently or contrary to law, in his gross receipts calculation.**

Mr. George testified that, in his process, he reviewed checks "for things that would be relevant" such as stating that it was for a "refund," versus things that he would likely not consider as relevant, such as checks that said "credit." Tr. 254:18–255:16, 257:21–258:3. Yet he testified that, "in this matter," he included checks that said "credit" in his gross receipts calculation. Tr. 257:21–258:6. But this is not true. For example, DX-DD is a check from BoA -5986 and its memo line states "Credit." But based on his own judgment, Mr. George decided not to include that check in his calculation. Tr. 355:10–24. From Mr. George's testimony, it is unclear whether Mr. George did, or did not, include other checks bearing the description "credit."

Mr. George also testified that he did not adjust his calculation for transactions that represent the cut that credit card processors take from the deposits. *See, e.g.*, Tr. 306:7–22, 324:18–19. As the Second Circuit held in *Verity*, "[t]he appropriate measure for restitution is the benefit unjustly *received by the defendants*." 443 F.3d at 67 (emphasis added). Mr. George acknowledged that these entries represent "money the payment processor took off the top, so the money was actually never received by Defendants"—another mistake. Tr. 318:6–9.

Simply put, whenever Mr. George encountered a line item he did not recognize, he guessed whether to include the transaction—rather than doing the work or research necessary for a sound analysis. *See, e.g.*, Tr. 307:2–308:14 (discussing treatment of various transactions). At best, this type of analysis is arbitrary and cannot meet the reasonable approximation standard. At worst, it represents an inherent bias in the calculation in which ambiguities were resolved in favor of the Government—it included similar transaction types when they would increase the total but ignored them when they would have decreased the total.

The transactions identified at trial are listed in Appendix B and summarized below.

|  | Conceded | Identified but Unexplained | Explained/ Disputed | Not Conceded/ Verity[9] | TOTALS |
|---|---|---|---|---|---|
| Number of Transactions | 69 | 1 | 2 | 17 | 89 |
| Dollar Amount | $39,666.56 | $3,152.66 | $1,220.00 | $17,102.76 | $61,141.98 |

The missing or misidentified transactions, and checks identified and conceded at trial, total $39,666.56. In comparison, Mr. George's total chargeback and refund calculations for his entire review, from May 2014–April 2017, were $69,507.41 and $325, respectively. Tr. 224:4–6. Based only on the missing or misidentified transactions and checks identified and conceded at trial, at a minimum, Mr. George missed over 36% of the total chargebacks and refunds that he should have included in the calculation. This signals serious, underlying defects in his calculations.

Defendants only cross-examined Mr. George on his calculations relating to one bank account, BoA -5986, which represented 24% of the Government's total demand.[10] It seems likely, given Mr. George's high error rate and biased assumptions, that Mr. George's analysis includes comparable errors in the other bank accounts. The work done collectively by Defendants and Mr. George during cross-examination is merely the beginning of the sort of work the Government should have been doing for the past year-and-a-half.

### 3. The gross receipts calculation impermissibly includes monies owned by a non-defendant.

Plaintiffs did not name Tech Logic Support, LLC as a defendant in the Complaint and pled no allegations relating to Tech Logic Support, LLC. Despite this, Mr. George's calculation

---

[9] Defendants maintain that these identified transactions, as well as similarly described transactions, are subject to the same analysis as identified in *Verity*, and the Government should not have included them in its monetary demand.

[10] Defendants also examined a few readily identifiable checks provided from other accounts. *E.g.*, Tr. 355:1–356:16, 374:8–375:14, 375:15–376:19.

includes monies owned by Tech Logic Support, LLC. Tr. 173:17–174:10; *see* GX-13 (bank records and checks from Tech Logic Support, LLC's Regions Bank Account ending in -7679). Plaintiffs have not established and cannot establish a right to recover money from a non-defendant never mentioned in the Complaint. As Defendants asserted at trial, and this Court recognized, inclusion of records and monies from a non-defendant raises serious jurisdictional concerns. Tr. 160:3–164:17.

This Court has no jurisdiction over a non-defendant. *Cf. In re Infant Formula Antitrust Litig., MDL 878 v. Abbott Labs.*, 72 F.3d 842, 843 (11th Cir. 1995) (holding that a district court lacks subject matter jurisdiction to issue a preliminary or permanent injunction against a non-party). Nor is it enough for Plaintiffs to assert that Tech Logic Support, LLC was part of a "common enterprise" because "common enterprise" is a theory of vicarious liability and theories of liability must be pled. *See Wilcox v. Green Tree Servicing, LLC*, No. 14-1681-T-24, 2015 WL 2092671, at *1 (M.D. Fla. May 5, 2015) ("[T]he Court can only consider the claims and theories of liability that Plaintiff actually pled in [the] complaint."). Moreover, this Court's Summary Judgment Order is silent on Tech Logic Support, LLC and only cites the named Defendants when discussing common enterprise. Summ. J. Order at 1, 11, ECF No. 330 (defining "Vtec" as "Defendants Vylah Tec, Express Tech, and Tech Crew."). Plaintiffs are thus estopped from seeking any money related to Tech Logic Support, LLC and that company's inclusion further renders the Government's calculation infirm.

### 4.     Plaintiffs' discovery failures have foreclosed the possibility of a full evaluation of the Government's monetary demand.

Defendants never had and never will have access to the full body of Mr. George's work. As Mr. George testified, his step-by-step process involved: (1) receiving the bank records from Plaintiffs' counsel; (2) creating a new aggregated file of the bank records that he uploaded to CFIS;

(3) creating a verifying Excel spreadsheet to check the information generated by CFIS; (4) creating another Excel spreadsheet ("Undisclosed Report") that he used to make adjustments for items such as checks; and (5) using that same spreadsheet to create underlying detailed schedules that he provided to Plaintiffs' counsel as the basis for his gross receipt calculation. Tr. 231:19–232:8, 245:1–20, 251:8–17, 256:4–257:8. Mr. George's gross receipt calculation is wholly derivative of the Undisclosed Report. Tr. 215:5–18.

Contrary to Federal Rule of Civil Procedure 26, despite the variety of records Mr. George identified as part of his gross receipts calculation process, Plaintiffs provided Defendants only some underlying bank statements and a small number of checks, plus Mr. George's declarations in support of his calculations. That is insufficient under Rule 26. Despite their best efforts, Defendants were never able to get access to the methodology and documents that Mr. George used and provided to Plaintiffs' counsel in support of his work. At trial, the import of Plaintiffs' failure to disclose became obvious. *See infra* § VI (detailing Defendants' pending Rule 26 and 37 motion).

Throughout his cross-examination, Mr. George testified that, if he had his Undisclosed Report with him, he could have answered Defendants' questions. *See, e.g.*, Tr. 233:17–23 (could not identify how many entries made into BoA -5986), 234:12–16 (could not identify how many total consumer receipt transactions occurred), 309:23–310:22 ("I would have to look at [Undisclosed Report] to determine how ["DES: Deposit"] transaction was handled"), 327:15–328:13 (Undisclosed Report would allow him to know whether he included a specific charge described as "MTOT ADJ" in his calculation). Nor did Mr. George disclose his methodology for identifying checks he deemed relevant to include in his calculation. Tr. 355:1–356:9 (determinations of which checks to include were based on his own judgment). Moreover, Defendants only found out at trial that Mr. George potentially treated business-to-business credit

27

card transactions—certainly not "consumer receipts"—the same as consumer credit card transactions for calculating incoming funds, but he did not account for refund checks that he deemed payable to a business. Tr. 385:23–385:21, 394:12–16, 395:3–10. This is clearly erroneous, and the dollar amount of error assigned to these undisclosed assumptions remains unknown.

### 5. The Government's attempt to cure its error with tax forms fails.

The Government attempted to save its unreasonable calculation by introducing yet another new, undisclosed methodology by having Mr. George read aloud from tax forms given to him by Plaintiffs' counsel that list a non-witness as the preparer. Tr. 381:5–384:22. Other than some handwritten notes on the documents, Mr. George did not purport to have personal knowledge of these forms, did not use the forms to perform his gross receipts calculation, and never cited to them in any of his declarations. Tr. 381:5–384:22. The forms were not admitted into evidence. Tr. 381:5–384:22. Comparing documents that serve a distinct legal function—tax reporting—to a disgorgement calculation that must meet specific legal standards does not render the latter calculation reasonable nor does it cure the underlying infirmity.

## V. THE GOVERNMENT FAILED TO MEET ITS BURDEN AND IS NOT ENTITLED TO A MONETARY AWARD.

The Government made this Court several promises in its opening statement. First, the Government alleged that the Court would receive evidence showing the Defendants "did not record financial transactions contemporaneously as transactions took place[.]" Tr. 10:12–14. The evidence showed the opposite. *E.g., supra* § III(B). Ms. Alverson and Mr. Mukamal both testified to the reliability of the Defendants' records. *Id.* Both witnesses discussed how Authorize.net logged each transaction contemporaneously with granular detail such as consumer name, price, date, and, importantly, the product sold. *Id.* And both witnesses detailed V-Tec's other recordkeeping systems, V-Tiger, Five9, and the V-Tec Dailies. *Id.* The Receiver testified that he

found the data in Authorize.net to be sufficient for his purposes as Receiver, and indeed he relied on it for the years of 2016 and 2017. *E.g.*, Tr. 78:25–79:8, 94:14–18; *supra* § III(B)(1).

The Government also alleged that "the defendants did not have any mechanism in place to prevent manipulation of their accounting records." Tr. 10:14–16. As discussed above, there is *zero* evidence that any records were manipulated. Shelby Alverson's testimony highlighted the care she used in curating and using the records. And the Receiver's handwritten notes reflect that the databases were password-protected—and that he promptly changed the passwords when he took control. *E.g.*, Tr. 76:13–25, 99:9–17.

The Government also claimed that the Authorize.net database "only covers a period beginning in 2015 . . . . [T]he evidence is expected to show that $1 million churned through the operation before the defendants even began using the Authorize.net database." Tr. 11:18–20. This also is false: Ms. Alverson testified on cross-examination that the database began in 2014, Tr. 492:18–24, and the review of the bank statements with Mr. George showed payments for AuthNet Gateway beginning in the same year. *See* Tr. 337:11–19. The Government offered no rebuttal to this testimony. Finally, the Government's assertion that one million dollars "churned" through the accounts preceding the existence of Authorize.net data was never supported by testimony at trial. For all these reasons, Defendants ask that the Court grant their still-pending Federal Rule of Civil Procedure 52 Motion, which was made at trial. Tr. 398:20–401:18, 409:17–412:9.

### A.   This Court should enter an award of zero dollars.

What the Government gave to this Court during its affirmative case was an unreasonable, unreliable guess at monetary relief. Mr. George's testimony revealed that his calculations not only suffered from facial errors amounting to tens of thousands of dollars, but that his underlying methodology and assumptions were irreparably flawed. Nothing Mr. George presented to this Court can be trusted. Furthermore, the law, including the law of this case, requires that the

Government trace any money it seeks to challenged, allegedly deceitful behavior. At trial, the Government did not even attempt to do this, instead claiming that Defendants' kept their records so poorly as to prevent such analysis. But the testimony at trial, including from the Government's own witnesses, showed that detailed records were available, the Government had them, and the Government could use them. It simply chose not to. The Court should not reward the Government for falling below a standard it would apply to any litigant and presenting an error-riddled figure that is untraceable to *any* deceitful conduct. Defendants ask this Court to enter a finding that Plaintiffs failed to present a reasonable approximation and thus enter a judgment of zero dollars against all Defendants.

### B.    An alternative amount of $4,804.83 may also be appropriate.

In the alternative, if this Court disagrees and believes an entry of judgment is necessary on the sixty-six calls that were part of the summary judgment record, then Defendants presented, through the testimony of Shelby Alverson, an alternative figure: $4,804.83. Tr. 442:14–443:2, 452:23–452:2; DX-A. This is the sum total of the sales made on the sixty-six calls for which this Court ruled.[11] It is the only number supported by evidence of identifiable sales and is the maximum amount of money traceable to *any* alleged unlawful conduct.

What the Government asks for—the entirety of Vylah Tec's sales receipts—is based on a tiny percentage of the calls Vylah Tec actually handled. As DX-MA illustrates, the sixty-six calls the government submitted as part of the record only represent 0.015 % of the total body of Vylah Tec's calls. The Government made no effort to prove that these calls are representative of the entirety of Vylah Tec's work, and indeed, failed to disclose or account for evidence to the

---

[11] At trial, Ms. Alverson testified that PX 179, with a $300.00 sale, was not a Vylah Tec call. Tr. 449:11–22. Should the Court back that number out of the total value, the new value would be $4,504.83.

contrary—such as the FTC's own test calls. When facing voluminous allegations, "'[t]he Court cannot adopt the FTC's approach of using selected examples of claims picked from across the entire universe of the FTC exhibits, seemingly without a clear methodology, and draw conclusions as to every one of Defendants' sites [or representations].'" *DirecTV, Inc.*, 2018 WL 3911196, at *5 (citation omitted).

Here the Government has shown it has no clear methodology and merely attempted to perform "simple arithmetic." *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006) ("Rule 26(a) requires . . . a 'computation,' supported by documents. . . 'simple arithmetic' calculation is wholly inadequate as a measure of damages[.]"); *accord Water v. HDR Eng'g, Inc.*, No. 08-2446, 2011 WL 13176484, at *5 n.5 (M.D. Fla. May 11, 2011) ("[D]amages computation is especially necessary when plaintiff seeks complex damages such as lost profits."). It made no effort to trace any of the money it seeks to alleged unlawful behavior, and thus cannot be awarded any monetary award beyond the sixty-six[12] calls it has entered into the record.

At trial, the Government went to lengths to show that the sixty-six calls in evidence were insufficient to demonstrate sales to the customers on those calls. Tr. 474:12–19. Defendants readily stipulate that the sixty-six calls were not representative of the whole. Tr. 474:21–23. And yet, the Government insists that those calls are representative of hundreds of thousands of other calls, *see, e.g.*, GX-4A-1 & GX-5A-1 ("Total Calls"), that are not before the Court. The Government's theory is that all the calls were based on scripts. But Ms. Alverson testified that V-Tec employees did not always follow scripts. Tr. 472:13–14. In fact, in referring to the sixty-six calls in evidence, she stated "[n]ot all these are scripts." Tr. 471:20–25. One of the calls is not even from Vylah Tec. Tr.

---

[12] Defendants maintain that PX 179 was not a Vylah Tec call. If the Court agrees, the total would be sixty-five calls.

449:11–22. The calls made by FTC Investigator Michael Liggins show no use of a script in either call. DX-TA, DX-UA. If sixty-six calls that were cherry picked by the Government are not all consistent with the Government's claims, then they could not possibly represent the universe of calls the Government excluded. Because the sales from the sixty-six calls in evidence are the *only* sales with record support,[13] in the alternative, Defendants request that this Court enter a judgment of $4,804.83.[14]

### C.   No award should or can exceed the amount in the Receivership accounts.

Tracing particular funds is a requirement of any equitable form of restitution. "The general thread connecting these [restitutionary] remedies was that they did not 'impose *personal liability* on the defendant, but . . . restore[d] to the plaintiff particular funds or property in the defendant's possession.'" *Fed. Trade Comm'n v. AMG Capital Mgmt., LLC*, 910 F.3d 417, 434 (9th Cir.) (O'Scannlain, J., concurring) (generally reviewing "distinct restitutionary remedies" that "courts sitting in equity could impose"). In equity, tracing is required both by the law, generally, and the law of this case. *See supra* § II.

The Government has no ability to trace specific funds because it only relied on bank statements, which prevents tracing of specific funds to specific transactions from specific consumers. *See supra* §§ III(B), IV(B)(1). Moreover, the Receiver testified at trial that tracing any funds into the business accounts and the receivership's collective account is now impossible. Tr. 108:22–109:15, 113:5–113:17. The most that can be determined is that the amounts originally deposited into the receivership account stemmed from Defendants' business—although, even

---

[13] These are also the only calls subject to a direct ruling of the Court.

[14] Or $4,504.83, if the Court decides to back out the revenue from PX 179. *See supra* n.10.

these amounts improperly include Avanquest revenue and Tech Logic Support, LLC monies. *See* Tr. 105:14–21, 106:19–24, 113:2–17; *see also Vylah Tec LLC*, 328 F. Supp 3d at 1339.

Because any additional monetary award beyond the assets remaining in the receivership estate would be completely decoupled from any Vylah Tec operations, this Court should limit any award to funds that at least derived from the Defendants' businesses. *See Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1448 (11th Cir. 1985). Any other result would be unlawfully excessive under both federal and state law. *See Mason v. Ford Motor Co.*, 307 F.3d 1271, 1276 (11th Cir. 2002); *see also* Fla. Stat. § 768.74(5).

## VI.   DEFENDANTS MOVED UNDER RULE 26 AND 37 TO STRIKE THE PLAINTIFFS' MONETARY DEMAND.

Defendants' Motion to Strike the Plaintiffs' Monetary Demand pursuant to Rules 26 and 37, and the requirements of Rule 30(b)(6), is still pending. Tr. 396:9–398:13. Plaintiffs intentionally obstructed discovery, concealing the data, methodology, and calculations underlying Mr. George's monetary award figure. They did this both in violation of the affirmative, mandatory disclosure requirements of Rule 26, and by refusing to answer questions properly posed in the 30(b)(6) deposition. Because of this obstruction, Plaintiffs should not be able to present and rely on evidence that they concealed during discovery. If the Court grants this motion, striking the Government's monetary demand, then the Court need not reach any of the other issues presented at trial, such as equitable tracing or reasonable approximation.

### A.   The Government violated Rule 26's affirmative-disclosure requirements.

The requirement that a party must disclose both the damages computation and the documents on which the computation is based is clear. Defendants adopt here the law they cited to this Court previously in Motion in Limine 3. *See* Omnibus Mots. in Limine at 9–14, ECF No. 347. Trial bore out Defendants' discovery complaint. There, Mr. George made it clear that, outside

the bank statements, he used other tools and assumptions the Government never disclosed to Defendants. For example, Mr. George testified that he applied assumptions in performing his calculations—but he never recorded these nor did he provide them to Defendants. Tr. 230:19–231:5, 232:9–15, 236:22–237:11, 337:4–10. Mr. George generated his Undisclosed Report that included all the bank transactions and adjustments, which he gave to counsel for the Plaintiffs. Tr. 233:24–234:5, 265:20–22, 271:16–272:4. He retained the Undisclosed Report as well as other files foundational to his work. Tr. 274:8–12, 288:4–11, 283:16–18, 288:13–17, 289:15–23. Plaintiffs never disclosed the existence of these documents nor provided any of them to Defendants. He also prepared a spreadsheet to perform a quality check to ensure that he had a complete set of records from the time period. Tr. 245:1–21, 251:9–17, 263:15–19, 264:10–12, 287:11–22. Plaintiffs never disclosed its existence nor provided it to Defendants. When Mr. George added documents into CFIS, the proprietary software the Government used for accounting analysis, he created an aggregate PDF of all the bank files. Tr. 252:19–23, 253:4–8, 258:8–24. He retained this file. Tr. 283:21–284:9. It is unclear if the bank statements Plaintiffs provided to Defendants accurately reflect this document that Mr. George actually used in his calculation—or some other set of bank statements. All of the above are "evidentiary material . . . on which [the] computation is based," *see* Fed. R. Civ. P. 26(a)(1)(A)(iii), and so disclosure was mandatory—with no possible justification otherwise.

These failures violate Rule 26, prejudiced Defendants, and should trigger automatic exclusion of the Government's monetary demand. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*, No. 13-80371, 2015 WL 11251736, at *2 (S.D. Fla. July 29, 2015) ("Rule 37 acts as an *automatic* sanction barring the party from using that information or witness, unless the failure was substantially justified or harmless.") (emphasis added); *O'Brien v. NCL*

34

*(Bahamas) Ltd.*, No. 16-23284, 2017 WL 6949261, at *2 (S.D. Fla. Oct. 13, 2017) ("[T]he sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless.") (internal citation and quotation marks omitted). Disclosure would have allowed Defendants to test Mr. George's work before trial. The few documents Defendants did have access to—namely, the transactional data from the banks and a few checks—allowed Defendants to reveal significant errors in Mr. George's calculations and identify unreasonable assumptions he drew in favor of Plaintiffs. During oral argument on the Rule 26 and 37 Motion, the Government offered no argument that its failure was "justified" or "harmless." It was far from both. If Defendants had access to the underlying methodology and calculations, they could have examined the totality of Mr. George's calculations, assumptions, and methodologies. But they were never given the chance to do this, and that failure rests at the Government's feet.

### B.     Plaintiffs also violated Rules 30 and 37 by failing to answer questions during the 30(b)(6) depositions.

Defendants previously moved this Court for relief from Plaintiffs' violations of Rule 30(b)(6) and adopt that same law and argument here. *See* Defs.' Mot. for Sanctions against Fla., ECF No. 267; Defs.' Mot. for Sanctions against FTC, ECF No. 270; Defs.' Obj. re Order on Mot. for Sanctions against Fla., ECF No. 315. The Government had a duty to disclose this information in response to Defendants' requests but did not do so. The Government's failure to answer in Rule 30(b)(6) depositions violated the law. *See* 30(b)(6) Dep. of the FTC 177:02–177:22 (DX-HH-A) (FTC objecting on work-product privilege to question asking how the FTC arrived at its monetary relief figure).

On the stand, Mr. George shared, for the first time, details about his role in the case that far exceeded the contents of his declarations. The Government itself elicited this testimony. But

when Defendants asked for this information during the 30(b)(6) deposition, they were stonewalled, and the Government hid behind an erroneous application of work-product privilege. FTC 30(b)(6) Dep. 182:7–18 (FTC objecting on work-product privilege to question asking what Emil George's assignment on this case was). These are just two examples of the many times the FTC and Florida both obstructed Defendants' access to discovery. *See, e.g.*, FTC 30(b)(6) Dep. 189:24–190:18, 202:12–203:14, 203:21–205:14, 206:5–13, 210:18–211:23, 220:8–13, 222:1–22; *see also* 30(b)(6) Dep. of Fla. 46:7–16, 53:2–54:3, 57:17–58:1, 216:19, 222:5–224:13, 225:4–227:22 (DX-HH-B). Mr. George also admitted that he did nothing to prepare these 30(b)(6) witnesses. Tr. 238:23–25, 239:13–23, 284:13–19. Mr. George's testimony at trial buttressed why Defendants so desperately sought this information: it was rife with error and based on undisclosed and arbitrary assumptions. By obstructing discovery, the Government prevented Defendants from fully exploring Mr. George's calculations both before and during trial.

Although "[c]ourts have broad discretion in deciding whether and how to impose sanctions under Rule 37[,]" Order at 2, ECF No. 394 (citing *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997)), the bar for Rule 26 violations is automatic. Fed. R. Civ. P. 37(c)(1). This Court should find that Plaintiffs violated Rules 26 and 30 and sanction them under Rule 37 by striking their monetary demand. If this Court does so, it need not reach any of the other issues at trial, or in this brief, and could then enter a monetary award of zero dollars for Plaintiffs, thus resolving the case.

## VII.   THE FTC ACT DOES NOT PERMIT MONETARY RELIEF.

The FTC is an agency of limited statutory authority, but accumulated, small imprecisions in interpreting the FTC Act have created a body of law decoupled from statutory text and congressional intent. As noted in a recent case, "meta-textual pontifications seem good in the short run, but a long journey on even a narrowly wrong heading can be ruinous." *Fed. Trade Comm'n*

*v. Hornbeam Special Situations, LLC*, No. 17-3094, 2018 WL 6254580, at *6 (N.D. Ga. Oct. 15, 2018) [hereinafter *Hornbeam*]. Section 13(b) of the FTC Act allows the FTC, in certain cases, to seek an injunction against ongoing or future acts. *See* 15 U.S.C. § 53(b). It does not authorize monetary awards—a remedy that is limited to the procedurally more demanding Section 19. *See* 15 U.S.C. § 57b.

The Government may argue that such an approach received the imprimatur of the Supreme Court in *Porter v. Warner Holding Co.*, 328 U.S. 395, 397–99 (1946) (holding that "the District Court erred in declining, for jurisdictional reasons, to consider whether a restitution order was necessary or proper" when the Emergency Price Control Act of 1942 allowed for "other order[s]" to be issued in addition to an injunction or restraining order). Indeed, *Porter* has been the font of much mischief in this Circuit, and *dicta* from the case has been used to support the general proposition that "absent a clear command to the contrary, the district court's equitable powers are extensive" and include "the power to grant restitution and disgorgement." *Fed. Trade Comm'n v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996) (citing *Porter*, 328 U.S. at 398). Reaching this conclusion required excising the provision for "other order[s]" in *Porter* or, alternatively, reading such a provision into Section 13(b) where it does not appear.

If such an approach were ever valid in the face of express statutory differences between the Emergency Price Control Act of 1942 and Section 13(b) of the FTC Act, it is not valid now. The Supreme Court has since abandoned the approach to statutory interpretation used in *Porter* and its progeny, as it explained in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017).

> In the mid–20th century, the Court followed a different approach to recognizing implied causes of action than it follows now. During this "*ancient regime*," the Court assumed it to be a proper judicial function to "provide such remedies as are necessary to make effective" a statute's purpose[.]

37

*Id.* at 1855 (citing *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964)). Having abandoned the *Borak/Porter* approach, the Supreme Court affirmed that

> [w]hen an issue involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them. . . . In most instances, the Court's precedents now instruct, the Legislature is in the better position to consider if the public interest would be served by imposing a new substantive legal liability.

*Id.* at 1857 (cleaned up). Courts in this jurisdiction have recognized the Supreme Court's abrogation of *Borak. See, e.g.*, *Scales v. Mem'l Med. Ctr. of Jacksonville, Inc.*, 690 F. Supp. 1002, 1007 (M.D. Fla. 1988) ("It suffices to say that the *Borak* approach has been expressly abandoned[.]"); *Talib v. SkyWay Commc'ns Holding Corp.*, No. 05-282-T-17, 2005 WL 8160176, at *7 (M.D. Fla. Apr. 5, 2005).

The FTC seeks to impose personal liability of $3.4 million on two individuals without reference to whether the funds could be traced to money or property in their possession. This, as explained in *Verity*, is not equitable but legal damages; and the FTC's demand highlights how far from its equitable roots the application of Section 13(b) has strayed. *See Verity*, 443 F.3d at 66. Course correction against the FTC's persistent, extra-statutory demands has begun in the Third and Ninth Circuits, and the Eleventh Circuit also has begun to restrain the FTC's overreach in the previous appeal of this case. *See Vylah Tec LLC*, 727 F. App'x at 1002.

This Court should adopt Judge O'Scannlain's approach in his special concurrence in *AMG Capital Management, LLC*, 910 F.3d at 417, where he urged *en banc* review of this issue given the Supreme Court's decision in *Kokesh v. Securities & Exchange Commission*, 137 S. Ct. 1635 (2017). Vylah Tec has raised this issue previously in this Court, arguing that Plaintiffs' monetary demand is for legal damages, not equitable relief. *See, e.g.*, Defs.' Obj. to Mag. J.'s Order, ECF No. 246.

The monetary demand here bears the hallmarks that *Kokesh* described as characteristics that render disgorgement a penalty: (1) it is a consequence for violating public laws; (2) it is punitive rather than remedial; and (3) some funds are dispersed to the United States Treasury. *See Kokesh*, 137 S. Ct. at 1643–45. "Restitution under [Section] 13(b) shares each of these three characteristics with SEC disgorgement." *AMG Capital Mgm't, LLC*, 910 F.3d at 433. Thus, even if Section 13(b)'s specific use of "injunction" authorizes broader "equitable relief," it still would not allow for a monetary award.

Given recent Supreme Court decisions in *Kokesh* and *Timbs v. Indiana*, 139 S. Ct. 682, 689 (2019) (Eighth Amendment applies to government forfeiture actions "when they are at least partially punitive"), *see infra* § IX, and recent developments in the Third and Ninth Circuits to limit FTC action within the bounds of the agency's express statutory authority, it would be both appropriate and timely for this Court to apply the FTC Act as written and deny any monetary award under a case brought solely under Section 13(b).

**VIII.** SECTION 13(B) OF THE FTC ACT DOES NOT APPLY TO ACTIVITY WHOLLY IN THE PAST AND PROVIDES NO AUTHORITY FOR THE GRANT OF ANY MONETARY AWARD RELATING TO POP-UPS.

Section 13(b) only grants the FTC authority to obtain an injunction when a defendant is violating or is about to violate the law. 15 U.S.C. § 53(b). To invoke Section 13(b), the FTC must plead facts asserting either an ongoing or imminent violation of the law. Here, the Government pled ongoing use of pop-ups,[15] but pled no allegation or facts asserting future use. Compl. ¶ 17, ECF No. 2. Having conceded that there was no "ongoing use" of pop-ups (and thus no basis for

---

[15] In its motion in limine on this issue, Vylah Tec used the shorthand term "web advertising" to refer to pop-ups and other advertising used by third-parties to generate call leads. Omnibus Mots. in Limine at 32. As clarified at trial, this terminology referred only to third-party advertising and did not encompass Vylah Tec's websites. Tr. 6:3–8. Here, for clarity, Defendants use the term "pop-up."

those allegations), Pl.'s Mot. for Summ. J. at 2, ¶ 4, ECF No. 278, the FTC has no remaining basis for asserting a claim regarding activity that ended a year before the FTC even learned about Vylah Tec. Thus, no award can be granted relative to the use of pop-ups and the FTC bears the burden of identifying which, if any, pre-October 2015 sales transactions fall within the Court's finding of liability but outside the statutory limits on the FTC's claims.

Moreover, any allegation that a defendant is "about to violate" the law or that the FTC has "reason to believe" that a defendant is "about to violate" the law must be pled specifically *for each defendant. Hornbeam*, 2018 WL 6254580, at *6. Here, the FTC has failed to make the requisite showing for any defendant, much less for each defendant. The Third Circuit's recent opinion on the issue is correct and applies here. *See Fed. Trade Comm'n v. Shire ViroPharma*, 917 F.3d 147 (3d Cir. 2019). That court "reject[ed] the FTC's invitation to stretch Section 13(b) beyond its clear text," and held that where the FTC failed to plead that the defendant "is about to" violate the law and the defendant "indisputably is not currently violating the law," the FTC "fails to state a claim upon which relief can be granted." *Id.* at 150, 161. That is the case here and any monetary demand involving pop-ups should be struck. Here, as in *Shire ViroPharma, Inc.*, the Government did not plead that any defendant was "about to" commit a violation. And the Government has conceded that all use of pop-ups ended by October 2015. Pl.'s Mot. for Summ. J. at 2 ¶ 4. Accordingly, any challenge to the use of pop-ups is outside the plain language of the FTC Act.

The FTC will likely argue that pop-up advertising was only a portion of the challenged activity and thus statutory authority over long-ceased activity can be conjured *ex post facto* by tacking together discrete activities and calling it an ongoing pattern. But the FTC Act does not work that way. *See Hornbeam*, 2018 WL 6254580, at *2 ("[T]o the extent the FTC is basing its claims for relief on past misconduct, it must make a Rule-8-compliant showing that Defendants

are violating, or about to violate, the law.") The plain language of the statute agrees, providing that the FTC "may bring suit in a district court of the United States to enjoin *any such act or practice*." 15 U.S.C. § 53(b) (emphasis added). Nowhere does the statute provide that the FTC may sue for some other practice and then extend its statutorily limited authority over other non-covered practices.

Here, any allegation relating to long-ceased use of pop-up advertising is not "such act or practice" that satisfies the "is violating, or is about to violate" provision and thus, to the extent that the FTC is basing its claims for relief on the alleged use of pop-up advertising, any monetary award relating to those claims would not be authorized by the FTC Act.

## IX.  ADDITIONAL MONEY AWARDED TO THE GOVERNMENT WOULD BE UNCONSTITUTIONALLY EXCESSIVE UNDER THE EIGHTH AMENDMENT.

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend VIII. In February 2019, the Supreme Court ruled that the Excessive Fines Clause is enforceable against the States. *See generally Timbs*, 139 S. Ct. at 682. The Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'" *Id.* at 687 (citing *United States v. Bajakajian*, 524 U.S. 321, 327–28 (1998), and *Austin v. United States*, 509 U.S. 602, 609–10 (1993)). Remedies imposed in civil actions "fall within the Clause's protection when they are at least partially punitive." *Id.* at 689.

The Supreme Court also recently held that awards in government regulatory actions of "restitution measured by the defendant's wrongful gain" are punitive because they "go beyond compensation, are intended to punish, and label defendants wrongdoers as a consequence of violating public law." *See Kokesh*, 137 S. Ct. at 1645. Here, the Government's case is about alleged violations of the FTC Act and the FDUTPA—not a private controversy between the Government

41

and Defendants. The Government made its calculation of "restitution . . . without consideration of . . . expenses that reduced the amount of illegal profit" and so "does not simply restore the status quo [but] leaves the defendant worse off." *See AMG Capital Mgmt., LLC*, 910 F.3d at 433 (O'Scannlain, J., concurring) (citing and quoting *Kokesh*, 137 S. Ct. at 1644–45). The award is not limited to compensation because the FTC may send it to the Treasury and need not use it for consumer redress.[16] "Restitution under [Section] 13(b) therefore bears all the hallmarks of a penalty." *Id.* at 434. It is thus foreclosed.

### A. An additional award to the Government would be an unconstitutionally ruinous fine.

The Excessive Fines Clause carries two independently operative protections: Fines must be proportioned to the offense and they may be imposed only if they do not exceed a defendant's ability to pay. *See Timbs*, 139 S. Ct. at 693–95 (Thomas, J., concurring). The history of prohibiting excessive fines is replete with references to *salvo contenemento suo,* the ancient principle that fines may not deprive defendants of basic, independent economic viability.[17]  *See id.*

That ancient principle counsels particular caution in cases like this where the Government brings an individual claim of deceptive conduct "on the foundation of many thousands of conceptually separate claims associated with individual" consumers, proved through "generalized"

---

[16] Any monetary award will be rendered to Caesar, who will later determine whether consumers receive anything. *See, e.g.*, Fed. Trade Comm'n, Office of Claims and Refunds, 2018 FTC Annual Report on Refunds to Consumers at 1–2 (Feb. 13, 2019) [hereinafter FTC Claims Report 2018] (summarizing when and how much money is paid to U.S. Treasury's general fund out of FTC enforcement-action recoveries), *available at* http://bit.ly/2Ik9iEX.

[17] *See, e.g.*, 4 William Blackstone, Commentaries *372–73 ("[N]o man shall have a larger [fine] imposed upon him, than his circumstances or personal estate will bear"); *Timbs*, 139 S. Ct. at 694 (Magna Carta included the principle "'that no man shall be [fined] even to the full extent of his means[.]'" (citation omitted)); *United States v. Bajakajian*, 524 U.S. 321, 354–55 (Kennedy, J., dissenting) ("One of the main purposes of the ban on excessive fines" is preventing fines beyond a defendant's ability to pay.).

evidence that is "coordinated and aggregated by the State" but with no evidence about most of the underlying transactions. *See In re Zyprexa Prods. Liab. Litigation*, 671 F. Supp. 2d 397, 402 (E.D.N.Y. 2009).

The Government's theory of recovery is that every dollar of what it calls "consumer revenue" minus refunds and chargebacks constitutes ill-gotten gains. The Court should avoid any question of constitutional infirmity by abating what the Government seeks. *See, e.g.*, *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*, 777 S.E.2d 176, 204–05 (S.C. 2015) (South Carolina Supreme Court remitted nearly two-thirds of civil penalty under consumer protection statute in part to avoid constitutional questions of excessive fines under the state and federal constitutions).[18]

Awarding the Government's full monetary claim would contravene the doctrine of *salvo contenemento suo*. Defendants will have lost nearly all their wealth just through the imposition of the receivership—before any judgment has been rendered against them and before any additional burden of paying a monetary award to the Government. With the companies defunct and their other assets frozen, Defendants have lost their livelihoods, as well as their personal reputations, their contractual relationships, their expansion plans, their employees, and their peace of mind. The Government challenged none of these in the Complaint. None have been subject to a finding of liability. And none have been allotted any dollar value. They represented Defendants' lives, livelihoods, and dreams—and yet they are gone, taken without recompense before any finding of liability.

---

[18] In the alternative, this Court could suspend all or part of any monetary award. The FTC's most recent report on consumer redress notes that "some judgments are suspended by the court when a defendant has an inability to pay it." FTC Claims Report 2018 at 1 n.1.

**B.      The spirit of equity counsels against further punishment.**

Defendants' businesses are closed. All of their customers and clients are gone and, regardless of the outcome of this case, they can never re-engage in the business they pursued before. Their personal reputations are in shambles. Their many employees, such as Shelby Alverson, lost their jobs. Ms. Alverson testified that this "caused a catastrophic issue with [her family's] finances." Tr. 463:10–12. Ms. Alverson enjoyed her work so much that she prolonged looking for a new job in the hopes that Vylah Tec would re-open. Tr. 463:19–464:6. Defendants, and by extension their customers and employees, have already suffered by this action. Any further punishment would not only lock in the losses that the Cupos have already suffered, but would attack their future income, regardless of the source. Any such award would be punitive, not equitable, and thus is bounded by the Eighth Amendment. Equity, in its very definition, calls for a restrained and cautious ending to this case—one that will be just.

## CONCLUSION

From the beginning of this case, the Government has had access to quality evidence with which to make a reasonable estimate without undue burden (Authorize.net, Five9, and VTiger). Yet for strategic reasons wholly unrelated to any alleged unlawful conduct, the Government chose to use improper documentation that would result in a larger calculation that would be easier to make, with no need to do any real work. This is precisely the concern highlighted by the Supreme Court in *Timbs* as a primary reason for the constitutional ban on excessive fines. Awards and fines that are untethered to a defendant's conduct and wholly divorced from the best evidence are inherently abusive. They can be as much as the Government wants, inure fully to its benefit, and cost it nothing.

The Government has sought to deprive the Defendants of justice by obstructing discovery, using the wrong records, and presenting this Court with an error-ridden "approximation." The Plaintiffs had a burden to meet. They failed at every turn. That is not the fault of the Defendants.

This Court should not award the Plaintiffs a single dollar. Should the Court find that some award is proper, Defendants request that it be limited to the calls entered into the record for a total of $4,804.83—or $4,504.83, if the Court backs out PX 179. Regardless of the award, it should not exceed the maximum amount physically traceable: what currently sits in the Receivership account.

Date: April 9, 2019                    Respectfully submitted,

                                       */s/ Eric R. Bolinder*
                                       Eric R. Bolinder
                                       Julie A. Smith
                                       Michael R. Geske
                                       Cynthia Fleming Crawford
                                       Kara M. Rollins

                                       *Counsel for Defendants*
                                       *Admitted Pro Hac Vice*

                                       Cause of Action Institute
                                       1875 Eye Street, NW Suite 800
                                       Washington, DC 20006
                                       Telephone No. (202) 470-2396
                                       Facsimile No. (202) 330-5842
                                       Email: eric.bolinder@causeofaction.org

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on April 9, 2019, I electronically filed the foregoing document with the Clerk of Court for the United States District Court for the Middle District of Florida using the CM/ECF system, thereby serving all persons on the attached Service List who have registered with an ECF account.

Date: April 9, 2019

By: *<u>/s/ Eric R. Bolinder</u>*
Eric R. Bolinder